USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/26/2020__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
MICAH A. SALISBURY,                              :
                                                 :
                         Plaintiff,              :          No. 19-CV-706 (JLC)
                                                 :
            -against-                            :
                                                 :
ANDREW M. SAUL,                                  :
Commissioner, Social Security                    :
Administration,[1]                               :
                                                 :
                         Defendant.              :
--------------------------------------------------------------X

## OPINION AND ORDER

---

[1] Andrew M. Saul is now the Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Saul is hereby substituted for former Acting Commissioner Nancy A. Berryhill as the defendant in this action.

**Table of Contents**

I.   BACKGROUND......................................................................................... 1

   A.   Procedural Background ...................................................................... 1

   B.   The Administrative Record.................................................................. 3

      1.   Salisbury's Background..................................................................... 4

      2.   Relevant Medical Evidence ............................................................ 11

        a.   Treatment History ....................................................................... 11

         i.   Hospitalization of March 3, 2008........................................... 11

         ii.   Scott Levin, M.D.—Treating Orthopedist ............................. 11

         iii.   Syed Hosain, M.D.—Treating Pain Management Physician .............. 13

         iv.   Physical Therapy .................................................................... 16

         v.   Gurinder Mehar, M.D.—Treating Primary Care Physician................ 17

         vi.   East Orange Psychiatric Associates LLP .............................. 18

        b.   Opinion Evidence ........................................................................ 21

         i.   Physical Impairment Assessments.......................................... 21

          a)   Gurinder Mehar, M.D.—Treating Primary Care Physician ............ 21

          b)   Syed Hosain, M.D.—Treating Pain Management Physician........... 23

          c)   Jeffrey Degan, M.D.—Examining Neurosurgeon............................ 25

          d)   Sunitha Polepalle, M.D.—Independent Medical Examiner ............ 27

          e)   Rita Figueroa, M.D.—Consultative Surgeon.................................. 27

         ii.   Mental Impairment Assessments.......................................... 29

          a)   Todd Rochman, M.D.—Treating Psychiatrist ............................... 29

          b)   Alison Murphy, Ph.D.—Consultative Psychiatrist ....................... 31

        c.   Non-Medical Evidence ................................................................. 34

         i.   A. DelNero—SSA Single Decisionmaker.............................. 34

         ii.   Julie Salisbury—Spouse ...................................................... 34

      3.   ALJ Hearings................................................................................ 36

        a.   The 2010 ALJ Hearing ............................................................... 36

        b.   The 2011 ALJ Hearing ............................................................... 39

        c.   The 2018 ALJ Hearing ............................................................... 44

II.   DISCUSSION ......................................................................................... 49

   A.   Legal Standards ................................................................................ 49

      1.   Judicial Review of Commissioner's Determinations....................... 49

      2.   Commissioner's Determination of Disability ................................. 51

        a.   Five-Step Inquiry ........................................................................ 52

        b.   Treating Physician's Rule............................................................ 53

        c.   Claimant's Credibility.................................................................. 56

   B.   ALJ Decisions................................................................................... 58

      1.   The 2010 ALJ Decision................................................................. 58

      2.   The 2012 ALJ Decision................................................................. 60

3.    The 2018 ALJ Decision.................................................................. 61

C.  Analysis .......................................................................................... 68

   1.    The ALJ's RFC Determination is Not Supported by Substantial
       Evidence.................................................................................... 68

     a.   The Determination that Salisbury Can Perform Less than the Full Range
        of Sedentary Work as Defined by the ALJ Lacks Substantial Support .. 70

     b.   The Determination that Salisbury Can Be On Task At All Times Lacks
        Substantial Support................................................................... 75

   2.    The ALJ's Credibility Determination is Not Supported by Substantial
       Evidence.................................................................................... 77

   3.    Because the Record Contains Persuasive Proof of Disability, The
       Appropriate Remedy is Remand Solely for the Calculation of Benefits ..... 82

III.  CONCLUSION ...................................................................................... 88

**JAMES L. COTT, United States Magistrate Judge**.

Plaintiff Micah A. Salisbury, whose claim for a ten-month period of disability income benefits ("DIB") has been pending for more than a decade, seeks judicial review of the latest decision by defendant Andrew M. Saul, the Commissioner of the Social Security Administration, denying Salisbury's claim. The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The parties agree that reversal and remand are again required, although Salisbury seeks remand solely for the calculation of benefits, whereas the Commissioner seeks remand for further administrative proceedings. For the reasons set forth below, Salisbury's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded solely for the calculation of benefits.

## I.     BACKGROUND

### A.     Procedural Background

The instant action is Salisbury's third appeal in the 11-year history of his disability claim. Salisbury protectively filed an application for DIB on January 6, 2009, alleging a disability onset date of March 3, 2008. Administrative Record ("AR"), Dkt. No. 13, at 261–62.[2] The records indicate that Salisbury's date last insured is December 31, 2008. *Id.* at 120, 1442–43. The Social Security Administration denied Salisbury's application on April 30, 2009. *Id.* at 120, 146–

---

[2] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing System.

57.[3]  Salisbury challenged the denial and appeared with counsel before Administrative Law Judge Dennis G. Katz on July 28, 2010.  *Id.* at 95–119.  In a decision issued on September 16, 2010, ALJ Katz concluded that Salisbury was not eligible for benefits.  *Id.* at 121–36.  Salisbury then appealed to the Appeals Council, which, on July 18, 2011, vacated the ALJ's decision and remanded the case for further development of the record, reevaluation of the opinion evidence, and reassessment of Salisbury's residual functional capacity and credibility.  *Id.* at 137–40.

Salisbury next appeared before ALJ Katz for a rehearing on November 16, 2011.  *Id.* at 60–94.  On January 17, 2012, the ALJ issued another decision, again determining that Salisbury was not disabled.  *Id.* at 37–59.  On February 9, 2012, Salisbury appealed this decision to the Appeals Council, *id.* at 12, which denied review on February 28, 2013, rendering the ALJ's decision final.  *Id.* at 1–6.  Salisbury then filed an action in this Court, seeking judicial review of the ALJ's decision, which resulted in another remand to the Commissioner for the same reasons as previously cited by the Appeals Council—further development of the record, reevaluation of the opinion evidence, and reassessment of Salisbury's residual functional capacity and credibility.  *See Salisbury v. Colvin*, No. 13-CV-2805 (VEC) (MHD), 2015 WL 5458816 (S.D.N.Y. Sept. 1, 2015) ("*Salisbury I*"),

[3] There appears to have been a previously filed application, which was alluded to in the application at issue.  *Id.* at 261.  It was also denied.  *Id.* at 1442–43.

*adopted by* 2015 WL 5566275 (Sept. 21, 2015).  On February 23, 2016, the Appeals

Council instructed the ALJ accordingly upon remand.  *Id.* at 1439–41.

In his third administrative round more than two years later, Salisbury

appeared before ALJ Sharda Singh on April 30, 2018.  *Id.* at 1089–118.  In a

decision issued on September 21, 2018, ALJ Singh found Salisbury was not eligible

for benefits.  *Id.* at 1060–88.  Salisbury did not file written exceptions to the

Appeals Council in connection with this decision, which therefore became final on

November 26, 2018.  *Id.* at 1061.

On January 24, 2019, Salisbury filed the present action, seeking judicial

review of the most recent ALJ decision.  Complaint, Dkt. No. 1.  On March 29, 2019,

the parties consented to my jurisdiction for all purposes under 28 U.S.C. § 636(c).

Dkt. No. 11.  The Commissioner answered Salisbury's complaint by filing the

administrative record on May 1, 2019.  Dkt. No. 12.  On July 1, 2019, Salisbury

moved for judgment on the pleadings and submitted a memorandum in support of

his motion ("Pl. Mem.").  Dkt. Nos. 13–14.  On October 25, 2019, the Commissioner

cross-moved for judgment on the pleadings and submitted a memorandum in

support of his cross-motion ("Def. Mem.").  Dkt. Nos. 23–24.  Salisbury replied on

November 20, 2019 ("Pl. Reply").  Dkt. No. 25.

**B.**  **The Administrative Record**

The Court relies on (and incorporates) the facts set forth in *Salisbury I* for

Salisbury's relevant medical history through 2011.  Relevant facts from *Salisbury I*,

Salisbury's medical treatment from 2011 onward, and the proceedings on remand are discussed below.

### 1. Salisbury's Background

Salisbury was born on July 1, 1971 and was 36 at the time of the alleged onset date. AR at 261–62. He will turn 49 this year. At the time of the alleged onset date, Salisbury lived in New Windsor, New York, with his wife Julie, their three-year-old son, and newborn twins. *Id.* at 261–62, 1626. After completing his high school education in 1987, Salisbury immediately worked for his family's construction business. *Id.* at 415, 421, 616–23, 1626, 1647, 1655–66, 1678–85. He also served as an emergency medical technician and loss prevention investigator before starting his own trucking and landscaping business with his wife in 2004. *Id.* at 254–59, 415, 616–23, 1611–17, 1647, 1655–66, 1678–85. Salisbury not only managed the business but also handled the physical labor duties. *Id.* at 256 ("I did most of the paperwork, estimates, client care calls, dumpster drop-off and pickup, waste removal, lawn mowing, construction, gardening, snow plowing, shovel and salting, banking and vehicle maintenance. I worked 5–6 days a week; 5–8 hours per day.").

On March 3, 2008, Salisbury was involved in a rear-end collision, suffering injuries to his back and neck. *Id.* at 653–56. He alleged that, as a result of the accident, he was "no longer able to do the work listed above. [He] may [have] do[ne] an estimate. [His] wife often dr[ove] [him] to the site." *Id.* at 256. He was also able to "[p]lan routes and meet w[ith] customers – delegate all duties and make stop

checks to supervise[, do p]aperwork[,] billing, client care calls, banking." *Id.* at 1612. However, Salisbury was "no longer able to do anything for a full 8 h[ou]r day. Even the small duties [he] still c[ould] do [had to] be broken down into smaller time periods because [he was] not always able to drive or sit at [his] desk for lengths of time." *Id.* Salisbury explained it was "[v]ery difficult to keep the business running due to [his] inability to do physical duties, even to model for subcontractor. [He was] limited in time spent in the car[] or at [his] desk doing paperwork and banking or supervision of [the] job site." *Id.* at 259. After the accident, the business continued to operate; Salisbury subcontracted labor, while his wife handled administrative duties. *Id.* at 326. However, the business ultimately dissolved in 2010. *Id.*

Salisbury alleged that he was unable to work through his date last insured "due to the pain in [his] lower back." *Id.* at 1646. He described the pain as "constant," "[a]lways a dull throbbin[g] pain [which] bec[a]me[] stabbing if too much pressure [wa]s put on it." *Id.* at 613–14. Salisbury reported the pain was brought on by "[m]oving" and "sitting in one position [for] too long." *Id.* at 614; *see also id.* at 1668 ("It is very difficult to find a comfortable position and once I do I am unable to stay that way for very long."); 1675 ("[I]f I do too much it becomes more painful and acute."); 1676 ("acute pain brought on by sitting/laying in one position or putting weight on it/standing/walking"). He alleged that the pain radiated "[a]round to [his] other side and down into [his] legs," *id.* at 613, as well as "up the spinal column to between [his] shoulder blades." *Id.* at 1675. Salisbury reported having "limited

range of motion" and an inability to sit or stand for more than 15 minutes. *Id.* at 1646 ("I am unable to sit or stand for more than 15 min[ute]s, without being in pain, I am unable to lift anything. And any twisting motion of moving items from one place to another causes great pain."); *see also* 610 ("I cannot lift, stand, walk, sit, climb stairs, kneel, squat or reach for any length of time because I experience immediate pain and discomfort.");1672 ("Standing/walking/sitting no more than 10 min[ute]s at a time before resting."). He estimated that he could only walk for an eighth of a mile before needing to rest for three to ten minutes. *Id.* at 611, 1673.

In addition to back pain, Salisbury's disability claim is also based on his obesity and depression.[4] With respect to the former, Salisbury weighed 365 pounds at the time of the accident. *Id.* at 654. Regarding the latter, he alleged that stress or changes in schedule caused him to "shut down," *id.* at 612, and "become very depressive." *Id.* at 1674. He reported that while he was able to finish what he started and to follow instructions, he had problems paying attention. *Id.* at 611 ("I am unable to focus on conversation or to remember facts."); *see also id.* at 414 ("mentally unable to stay focused on task"); 1673 ("It is hard to maintain focus on one thing for a long period of time. Often ask people to repeat what they said."). He also described having trouble with his memory and needing reminders for activities like showering and taking medication. *Id.* at 607, 1673–74; *see also id.* at 612 ("even basic things, tasks, upcoming events I can't recall").

---

[4] Salisbury also suffered from diabetes mellitus type II, hypertension, and ulcerative colitis. Because he never alleges these impairments were disabling—nor does the evidence in the record suggest they were—the Court will not address them.

In describing his activities of daily living, Salisbury reported: "I am unable to care for myself and family. I rely on my wife for everything." *Id.* at 615. While he was able to feed his children meals that were prepared in advance by his wife and work on a computer for 20 minutes during the children's naptime, he otherwise spent the rest of the day, including during the children's playtime, reclining in a chair "to [al]leviate the pressure." *Id.* at 606 ("I spend mo[s]t of the day in the recliner because I have the least amount of pain there."); 609 ("I spend all of my time in the recliner because it is the least painful position for me."). Salisbury alleged that a babysitter would come by to dress and change the infants and put them down for naps, and his wife would return home at three in the afternoon. *Id.* at 606. At that point, he did not "do much else until [it was] time to go to bed." *Id.* at 1668. His wife also tended to their family pets. *Id.* at 606, 1668. Moreover, "[i]t [wa]s difficult for [him] to stand and cook in the kitchen," *id.* at 607, so "[a]ll [his] food [wa]s either prepared by [his] wife or frozen and just need[ed] to be heated." *Id.* at 1669 ("Unable to stand at counter, fridge or stove for long periods of time – I can place something in microwave and then sit down."; "I used to be able to at least do basic things such as eggs & pancakes at breakfast or grill to help out with lunch or dinner."); *see also id.* at 607 ("I eat a lot more frozen and fast foods because it is hard for me to prepare food.").

Salisbury alleged that although he had "no problems" actually feeding himself, he had difficulty grooming himself and taking care of other personal needs. *Id.* at 606–07, 1668–69. He was "unable to stand long enough to [] shower and

shave," which he therefore did less frequently. *Id.* at 430; *see also id.* at 606–07 ("I am unable to shower on a regular basis. It takes a lot out of me to do so, now I only shower 2x week."; "I used to cut my own hair every 2 weeks, now I barely cut it every 2 months."; "Shaving is a long process, so I only do it periodically."); 1668 ("Unable to take a full shower more than 3x and unable to shave more than 1x/wk."); 1669 ("I have always cut my hair now I can only do so 2x/month. Unable to shave on shower days, no more than 1x/week."). Using the toilet was also difficult because he experienced "immense pain from sitting for too long." *Id.* at 607; *see also id.* at 1669 ("Due to other health conditions that require often sitting on the toilet for long periods, I am often in a lot of pain.").

Salisbury stated that, prior to his injury, "[he] could completely care for the animals and [he] could cook and prepare meals. [He] also could stand long enough to change and dress the kids. [Now, he] cannot play/interact with them as [he] previously had done because of the pain [he is] in," *id.* at 606, as well as "do more driving, sit longer at computer. Any physical labor such as mow lawns, plantings, use leaf blower, electrical work, construction work, make deliveries, junk removal," *id.* at 1668, he alleged, he no longer could do. Since his accident, he could only do light household chores, such as washing laundry, sweeping, pushing dishes away, small repairs such as changing a light bulb or the batteries in a smoke detector, *id.* at 608, 1670, but no other house or yard work because it was "too hard and painful for [him] to do the things that [he] used to do." *Id.* at 608.

Salisbury went outside "only if there [was] somewhere [he] need[ed] to go; ex., post office, bank, doctors." *Id.* at 608. He went to the post office and bank about once or twice a week. *Id.* at 610, 615, 1672, 1677. Otherwise, he did not go out because there was "[n]o comfortable place to sit or position myself." *Id.* at 608. He was able to drive and ride in a car but for "[o]nly short distances." *Id.*; *see also id.* at 1668 ("[p]ossibly go run errands no more than ½ h[ou]r in car"), 1670. He only shopped in stores and online for holiday gifts and business items two to three times per month "because it [took] twice as long due to pain and the need to stop and rest frequently." *Id.* at 609, 1671. His ability to handle money had also changed as he was "more forgetful and unable to sit for a long period of time to balance accounts." *Id.* at 609. His hobbies had once included watching television, softball, gardening, and woodworking. *Id.* at 1671. However, he "was no longer able to play softball[. He could] only coach. No more woodworking at length—one project might take 4x longer than it used to. [He j]ust over[saw] all outside/landscaping work. All [he did] was] watch T.V. . . . ." *Id.* Although he reported spending times with others, including his family, *id.* at 610, 1672, he did not "feel like going out much due to change in emotions (depression) and [he] also [did not] go out to restaurants because it [wa]s very uncomfortable to sit." *Id.* at 610.

Along with physical and mental therapies, Salisbury treated his impairments with various medications, including, among others, Tramadol, Cyclobenzaprine, Lidocaine patches, Voltaren gel, Meloxicam, and a transcutaneous electrical nerve stimulation (TENS) unit for his back pain, as well as Zoloft, Abilify, Sertraline, and

Wellbutrin for his depression. *Id.* at 420, 429, 442, 453, 615, 1652, 1677, 1694, 1698. Salisbury reported that the medications for his back pain provided immediate but temporary relief. *Id.* at 614, 1676. He also took Ambien for sleep difficulty. *Id.* at 420; *see also id.* at 606 ("I am unable to sleep on my own and I wake often due to the pain from lying on in one position."); 1668 ("Muscle spasms wake me up, it is a very restless night."). He was prescribed a back brace, which he claims he needs "[w]hen standing or walking for any length of time" and "[w]alking long distances." *Id.* at 611, 1673.[5]

According to Salisbury, "I have been seen by a doctor on a regular basis my whole life and never had any back pain or been seen for any back issues. This has caused a total change in my life. I am unable to do my own business-landscaping. It has also inter[]fer[]ed in my daily life where I am no longer able to care as I did in the past for my small children." *Id.* at 1654; *see also id.* at 1615 ("The accident has been debilitating to not only my employment but also my family. I chose to start my own business so I could be out, doing things and be able to work my hours around my wife's schedule so I could be home with the kids. I cannot do any work outside and am unable to care for my children properly."); 1677 ("Unable to work, unable to lift children/play with them, unable to keep up with household chores, don't go out

---

[5] One consultative examiner in 2017 noted Salisbury used a cane, *id.* at 1828, and Salisbury testified in 2010 that he was prescribed one. *Id.* at 98. While it appears that Salisbury may have needed or used a cane after the relevant period, no prescription for one or any other mention of a cane can be found in the record, and, at the time of his application, he denied using any assistive device other than the back brace. *Id.* at 611, 1673.

as much-hard to drive."); 1685 ("I have always had very labor intensive jobs, it is very difficult to continue to do any of the previous activities I have done in the past. Being self-employed it is not possible for me to go back and do all the physically demanding work I used to do prior to the accident.").

### 2. Relevant Medical Evidence

#### a. Treatment History

##### i. Hospitalization of March 3, 2008

On March 3, 2008, Salisbury was assessed for back and neck pain in the Emergency Room of St. Luke's Cornwall Hospital following his motor vehicle accident. AR at 653–56. X-rays of the lumbar spine and cervical spine were taken at that time. The x-ray of the lumbar spine revealed no evidence of fracture but evidence of degenerative disc and joint disease. *Id.* at 497. The x-ray of the cervical spine revealed no evidence of fracture. *Id.* at 498. Salisbury was discharged with a diagnosis of muscle spasm and advised to follow up with his primary care physician. *Id.* at 655.

##### ii. Scott Levin, M.D.—Treating Orthopedist

Following the accident, Salisbury first sought treatment with Scott Levin, M.D., of Somers Orthopedic Surgery and Sports Medicine Group PLLC, on March 25, 2008. *Id.* at 644–46. On initial examination, Dr. Levin reported the following findings:

> [Salisbury] has diffuse cervical paraspinal muscle tenderness. He has good range of motion in flexion, extension, and lateral rotation with minimal discomfort. He has 5/5 strength in his upper extremities including shoulder abduction, elbow flexion, wrist extension, elbow

> extension, wrist flexion, and finger abduction. He has diffuse
> tenderness in the lumbar spine and the paraspinal muscles. He has
> 5/5 strength of his lower extremities including iliopsoas, quadriceps,
> tibialis anterior, EHL, and gastrocsoleus muscles bilaterally. He has a
> 2/4 deep tendon reflexes of the patellar tendon bilaterally. No clonus
> and negative straight leg raise test bilaterally.

*Id.* at 646. Based on the physical examination and a review of the x-rays taken on

the date of injury, Dr. Levin assessed cervical and lumbar muscle strains and

prescribed physical therapy, Mobic, and Flexeril. *Id.*

On April 16, 2008, Dr. Levin performed a subsequent physical examination

and found the following:

> On physical exam, he has quite a bit of tenderness to palpation
> diffusely in the lumbar spine. He has 5/5 strength of his lower
> extremities bilaterally in all muscle groups tested. His sensation is
> equal and intact bilaterally. Symmetric 2/4 deep tendon reflexes of the
> patellar tendon bilaterally. No clonus bilaterally. Negative straight
> leg raise test bilaterally.

*Id.* at 648. Dr. Levin assessed lumbar muscle strain, prescribed a lumbar corset,

and ordered an MRI "[s]ince this pain has been going on for up to six weeks now

without any improvement at all." *Id.* Dr. Levin also provided a note prescribing

that "Micah is out of work until further notice due to his back injury." *Id.* at 649.

On April 30, 2008, Dr. Levin conducted another physical examination of

Salisbury: "On physical examination, he has significant tenderness to palpation

diffusely across the lumbar spine. He still has 5/5 strength of his lower extremities

bilaterally. Sensation is equal and intact bilaterally with symmetric deep tendon

reflexes and no clonus bilaterally." *Id.* at 651. Dr. Levin reviewed the MRI, which

was taken on April 23, 2008 and revealed a mild bulging disc at L5-S1 and bilateral

facet arthritis at L4-L5 but no other disc herniations or osseous abnormalities. *Id.* at 494–95. Dr. Levin assessed the following: "Persistent low back pain that is not responding to physical therapy or medications. At this point, I would like him to see Dr. Nick Panaro for further evaluation and treatment of this pain. I have provided the patient today with another prescription for the muscle relaxant which seems to be helping somewhat." *Id.* at 651. Dr. Levin wrote prescriptions for Percocet and Flexeril and again provided a note prescribing that "Micah is out of work until further notice." *Id.* at 652.

On May 20, 2008, Dr. Levin signed the following note:

> This is a letter of medical necessity for patient Micah Salisbury. Mr. Salisbury is a 36-year-old male who initially presented to my office on 03/25/08 complaining of neck and lower back pain after he was involved in a motor vehicle accidence on 03/03/08. At that point, I diagnosed him with cervical and lumbar muscle strains and started him on physical therapy and gave him some anti-inflammatory medications. I then saw him back a few weeks later for reevaluation. He continued to have quite a significant amount of discomfort in his lower back at that point. Since he had ongoing pain in his low back for several weeks despite conservative management including anti-inflammatory medications and physical therapy, I believe it is medically necessary to obtain an MRI scan of the lumbar spine to rule out a herniated disc.

*Id.* at 526. There is no record of any further treatment with Dr. Levin.

### iii.    Syed Hosain, M.D.—Treating Pain Management Physician

Salisbury began treatment with Syed Hosain, M.D., Board Certified in Anesthesiology and Pain Management, of St. Luke's Cornwall Hospital for pain management on June 24, 2008. *Id.* at 501–02. Dr. Hosain reported the following findings upon examination of the back:

> Palpation over the left and right lumbar paravertebral areas was
> diffusely tender at L1 2 through L5 S1 levels. The range of motion of
> the lumbar spine was flexion 50 degrees, extension of spine 10 degrees,
> lateral bending to right 15 degrees, lateral bending to left 15 degrees.
> Movements of back were limited by pain felt in the back. There was
> preservation of the normal lumbar lordosis. Muscle spasm was absent
> in the lumbar spine. Trigger points were not identified in the lumbar
> para spinal muscles. The sacroiliac joints were non tender on left and
> right side.

*Id.* at 502. Dr. Hosain initially diagnosed lumbago and chronic lumbar strain,

prescribed a TENS unit for home, Lidoderm patch, cyclobenzaprine, and Ambien,

and provided a note that "Patient was involved in motor vehicle accident on March

3, 2008. [T]emporary disability for 30 days due to lumbago and chronic lumbar

strain." *Id.* at 502, 1783–84.[6]

   During his July 30, 2008 visit with Dr. Hosain, Salisbury "reported that he

continues to have aching throbbing pain in the middle of his back. Physical therapy

has so far been of little help to his pain. He denied any radiation of pain to the

upper or lower extremities. Pain is made worse by movement especially bending."

*Id.* at 1786. Dr. Hosain observed a normal gait but that Salisbury "remains

diffusely tender in his low and mid back" and assessed myofascial pain in the back.

*Id*. "Given the etiology of his pain and his past history of depression the patient is

likely to have persisting chronic back pain for some period of time. Recovery from

this condition is likely to be slow and drawn out. He may be a candidate for a trial

of and SSRI type of medication." *Id*. Dr. Hosain prescribed aquatic therapy and

---

[6] "Lumbago" is defined as "[p]ain in mid and lower back; a descriptive term not
specifying cause." *Stedman's Medical Dictionary* 1121 (28th ed. 2005).

continued to note that Salisbury "remains temporarily disabled due to chronic lumbar strain." *Id.* at 1787.

On August 26, 2008, during a follow-up appointment, Salisbury "told [Dr. Hosain] that he [wa]s using a TENS and applying lidocaine patch at night. When he ha[d] muscle spasm he t[ook] cyclobenzaprine. He reported no side effects from these medications. He reported that these medications d[id] reduce his pain by about 30 to 40%." *Id.* at 504. Dr. Hosain continued to observe a normal gait and assessed myofascial pain in the back. Salisbury's prescription for lidocaine patch and cyclobenzaprine were renewed. *Id.* Dr. Hosain wrote another note that "Patient remains temporarily disabled for 30 days . . . due to lumbar strain." *Id.* at 1788.

From October 2008 through September 2013, Dr. Hosain administered trigger point injections, as many as 13 injections during one visit. *Id.* at 505, 552, 554, 556, 712–13, 726–35, 993–1000, 2021, 2023. On March 26, 2009, Dr. Hosain administered an intraarticular facet injection. *Id.* at 736–37. During each of the visits, Salisbury complained of pain affecting the buttock muscles and, starting in 2010, the neck muscles as well. *Id.* at 505, 552, 554, 556, 712–13, 726–35, 993– 1000, 2021, 2023. At each visit, Dr. Hosain reported the following findings: "There is restrictions of range of motion in the back. There is muscular deconditioning in the gluteal muscles. Focal tender points and palpable taut bands are palpable in the gluteal muscles. There is a local taut response to snapping palpation in the gluteus muscles. The patient had referred pain on palpation of the trigger points in

the gluteal muscles radiating to the thighs." *Id.* Beginning in 2010, Dr. Hosain's

findings encompassed the trapezius muscles as well. *Id.*[7]

### iv. Physical Therapy

While under Dr. Levin's care, in April and May 2008, Salisbury underwent

physical therapy for his neck and back at St. Luke's Cornwall Hospital, although

his lumbar assessment did not change. *Id.* at 660–61. Likewise, while under Dr.

Hosain's care, Salisbury began physical therapy, including aquatic therapy, at

Fitness Forum Physical Therapy on August 3, 2008. *Id.* at 515. He continued

through September and October of that year. *Id.* at 521–25. On January 26, 2009,

Salisbury began physical therapy treatment at Peak Physical Therapy. *Id.* at 583–

87. Upon initial evaluation, Salisbury was assessed with a severe functional

limitation in active range of motion (50–74%); severe weakness (2/5); and severe

pain (8–9). *Id.* at 588. Salisbury was assessed by Tammy Ferrari, D.P.T., with the

following initial functional levels: for pain, "6–7/10 generally, up to 8–9/10 pain level

with spasm of R SIJ and lower thoracic region"; for strength, "3–4+/5 throughout B

LE myotomes"; for activities of daily living, "severely restricted, can't work, lift

---

[7] On November 3, 2008, Dr. Hosain wrote the following letter to Salisbury's insurance carrier: "This patient is under my care for injuries sustained in a motor vehicle accident in March 2008. The patient sustained injuries to the lower back muscles. He received treatment at my office consisting of trigger point injections that were a tremendous help to his pain. The pain was assessed at an independent medical evaluation and the report stated that the patient should no longer receive this treatment despite the benefit the patient gets from these injections. I request that the insurance carrier reconsider their decision to not allow Mr. Salisbury his treatment." *Id.* at 550. The insurer's decision presumably was reversed in light of the subsequent trigger point injections.

carry 5#"; and for active mobility, "trunk grossly <25%". *Id.* at 592. By February

25, 2009, he had attended nine appointments. Salisbury's range of motion,

strength, and performance of home exercises had all increased, and his functioning

had improved. *Id.* at 594. However, his pain had not decreased and gait had not

improved. *Id.*

> ### v. Gurinder Mehar, M.D.—Treating Primary Care Physician

Although Gurinder Mehar, M.D., had already been identified as Salisbury's

primary care physician at the time of the March 3, 2008 accident, *id.* at 655, the

earliest progress note in the record from Dr. Mehar is dated July 9, 2008. *Id.* at

631. Based on the record, Salisbury visited Dr. Mehar about two to three times a

year between 2008 and 2012 and once in 2015. *Id.* at 631–33; 1042–50; 1865; 1926;

2008. There are few objective findings in these progress notes, particularly with

respect to his back or mental impairments. *Id.*[8]

---

[8] For example, on Salisbury's first follow-up appointment since the car accident, Dr. Mehar simply noted his diabetes mellitus and back pain diagnoses and marked an entire line through all the check boxes under the review of systems, indicating normal readings, with no additional notes. *Id.* at 631. On October 10, 2008, Dr. Mehar merely diagnosed "dm" and noted "Byetta" under treatment while ambiguously checking a number of the systems review check boxes. *Id.* at 632. The October 29, 2008 progress note only included "paperwork for disability" and "disability form" as well as a line striking through all the review of system check boxes. *Id.* at 1050. The January 15, 2009 progress note only specified a follow-up on Salisbury's diabetes and a weight loss of 20 pounds. *Id.* at 1049. On March 12, 2009, Dr. Mehar again noted "disability paperwork" and listed Salisbury's diabetes, hypertension, and depression under past history. *Id.* at 633. The October 26, 2009 progress note appears to only concern "stuffy nose," "sore throat," and "cough." *Id.* at 1047; *see also id.* at 1042–46, 1865; 1926; 2008.

### vi.     East Orange Psychiatric Associates LLP

Salisbury first sought treatment at the East Orange Psychiatric Associates LLP ("EOPA") on February 28, 2009. *Id.* at 988. During intake, Salisbury reported his "constant pain" from the back injuries he suffered in the 2008 car accident and indicated that he used to have two to three bad days a month but now these days were "more frequent." *Id.* Salisbury explained that his depression was first diagnosed five years prior in 2004, since which time he has been taking Wellbutrin prescribed by Dr. Mehar. *Id.*

Salisbury's first counseling session, conducted by social worker Richard Sullivan, LCSW, described the origin of Salisbury's depression when, in 2004, Salisbury suffered the sudden loss of both his father and his job. *Id.* at 837–38. He started to become ill and vomit uncontrollably. *Id.* When he was seen at the hospital, he was diagnosed with depression. *Id.* He had never received mental health treatment before other than with his primary care physician. *Id.* He had one bad day a month, but recently they were becoming more frequent. *Id.* His symptoms were described as follows: "no interests, head feels fuzzy, due to the pain, doesn't get much sleep, exhausted all the time, behind his eyes, when he's not feeling well he feels pressure or fuzzy (What he means is when he's not feeling well mentally). Low concentration, forgetfulness. Take[s] a lot of notes. Post[-]it notes at home, to remember things. Has thought of self harm, the last was one year ago." *Id.*

The record indicates that Salisbury continued to meet with Mr. Sullivan or another social worker for one-on-one counseling sessions two to four times a month between March 2009 through May 2010 and at least three times in 2011, discussing the start of his depression, the impact of the 2008 car accident, his family, his feelings of inadequacy, and his suicidal ideation, among other issues.[9] At the same

---

[9] *See, e.g., id.* at 828–36; 989–90 ("Depressed last 5-6 years. Car accident 1 year ago. Muscular back injury. Lower back pain is constant. Medication includes Tramadol, steroid injections, and Ambien. Depression went from 1-2x month to 1-2 weekly. He thinks 'it's starting to both me that this is a permanent injury.' Owns a landscaping company- Can't do the work anymore.") (March 1, 2009); ("5 to 6 years ago, father died and lost job. Got Wellbutrin. Did okay until 1 year ago had a car accident. Rear-ended. Lower back injury. Unable to work. Has a landscaping business. He is not doing well. Bad days increasing. Isolated. Emotional. Tearful. Sad. Occasional suicidal thoughts.") (March 12, 2009); ("Discussed issues and set goals. Issues include death of father, death of mother, car accident and resulting pain.") (April 28, 2009); ("Discussed symptoms of being tired, head cloudy, memory problem. Not feeling like normal self, hazy, fuzzy.") (May 12, 2009); ("Continues to be depressed. Frequently tearful. Multiple issues. Wants to see a family therapist. Will start Thazadone.") (May 20, 2009); ("Wants to talk about the hard things going on in life. Difficulty talking. Needs to be asked questions. Cannot talk to wife. Cries easily. Depression for six years. Father died and lost job unexpectedly in same year. Car accident one year ago → increased depression. Chronic pain. Owns landscaping business. Wife is a teacher. 3 children. Not producing money. Needs help with children. Not suicidal or homicidal at this time. Serious financial problems. Realizing back pain will be chronic. Hits self in head in frustration. Will investigate possible help caring for children.") (June 3, 2009); ("Bad day today. Not processing things right. Kids more needy. Separation anxiety. Needs them. If they go to school he can't protect them. Do they protect you? –> Tears. Kids keep him alive – would have taken my life' otherwise. Can't say goodbye to them. Plan? No, not really. Carbon monoxide. 'I'm a wimp.' Thinks about death a lot. How people would handle it. Wife would be made. Brothers blame themselves. Contract made verbally to not harm self without consulting doctor or self first. Not homicidal. Discussed hospitalization. Pt denies need or risk to himself. Very depressed! Resistant to change.") (June 10, 2009); ("Pt reports that he is feeling a little better. . . . Pt reports that he is not suicidal. Does think about death a lot and how his death would affect others. Adamantly denies plans or risk.") (June 25, 2009); (Depression "[p]rob. started long because Micah's accident. Family stress, deaths, job loss. Beginning of M. depression. Underlying money always the issue.")

time that Salisbury went in for counseling, Todd Rochman, M.D., a psychiatrist at

EOPA, managed his psychiatric medication. *Id.* at 837 ("He has an appt for Dr R to

do the mental health meds."); *see also id.* at 839, 991 (EOPA medication summary,

documenting each review of medication from March 12, 2009 through August 29,

2011). Salisbury testified that he saw Dr. Rochman "usually about once a month"

for medication review while he underwent therapy "probably every two or three

weeks", notes from which Dr. Rochman apparently reviewed. *Id.* at 74, 114. It is

not clear whether Dr. Rochman authored any of the notes from Salisbury's

counseling visits.[10]

---

(July 29, 2010); ("At this time, pt continues to feel profoundly discouraged. Hopeless, doubting that he will ever be able to adequately provide for his family. Within a reasonable degree of certainty, the patient will continue to need psychiatric care to treat his depression as long as he is in pain and cannot provide for his family. 'Life shouldn't be this hard.' Vague suicidal thoughts. Denies any risk. No plans. No intent.") (March 3, 2010); ("Stopped taking Zoloft 10 days ago. Withdrawal symptoms. I describe it as self-destructive. He doesn't acknowledge this. Poor judgment. Abilify not working he says. Not sleeping, eating, etc. Caring for 2 year old twins and 3 year old. Wife teaches. Son having speech therapy. Suicidal ideation but denies plans or motivation. Knows he needs to take Zoloft.") (March 23, 2010); ("In pain. Tried to weed work. Cannot work – very frustrating. Difficulty communicating with wife. Struggling to maintain some sense of normalcy in his family life.") (May 29, 2010); ("Consequently, additional strain has been placed on their emotional relationship causing even greater depression. Pt further reports that he is unable to assist his wife in any chores that require muscular strength furthering his loss of self esteem.") (Undated).

[10] The record also contains notes from Salisbury's more recent treatment, years after the relevant disability period. Salisbury began to see Margarita Kogan, M.D., in 2012 for all of his conditions in order to streamline his care with one physician as opposed to treating with various doctors. *Id.* at 1107, 1866–2103. Dr. Kogan's records for the period October 15, 2012 through December 4, 2017, discuss only his diabetes mellitus and blood pressure for which she prescribed medication. *Id.* at 1866–2103. Salisbury also underwent regular chiropractic adjustments for the

### b. Opinion Evidence

#### i. Physical Impairment Assessments

##### a) Gurinder Mehar, M.D.—Treating Primary Care Physician

Dr. Mehar completed a residual functional capacity assessment dated October 29, 2008. *Id.* at 841–49. Dr. Mehar diagnosed lower lumbar spine pain, citing the MRI scan (presumably the April 23, 2008 image ordered by Dr. Levin). *Id.* at 841. According to Dr. Mehar, Salisbury's symptoms included pain, difficulty walking, and difficulty sitting, *id.*, and his treatment included physical therapy, aqua therapy, TENS unit, Lidoderm patches, Ambien, Flexeril, and an anti-inflammatory medication. *Id.* at 842. Dr. Mehar described a poor prognosis with an expected duration of 18–20 months. *Id.* Dr. Mehar noted depression without elaboration. *Id.* Regarding physical limitations, Dr. Mehar contradictorily marked no limitation with respect to Salisbury's ability to lift and carry while also indicating that he could occasionally lift and carry and that the amount of weight Salisbury could lift and carry was "none." *Id.* at 845. Dr. Mehar also determined that Salisbury could stand/walk for less than two hours and sit up to six hours per workday. *Id.* at 846. Finally, Dr. Mehar assessed a limited ability to push and/or pull. *Id.* Dr. Mehar again noted less than full range of motion in the spine (both flexion-extension and lateral flexion). *Id.*

---

period September 19, 2013 through May 18, 2015 for his neck and upper back pain with Dr. Erik Brower at Innate Chiropractic. *Id.* at 2026–60.

On or about January 12, 2009, Dr. Mehar completed an assessment for the New York State Office of Temporary and Disability Assistance. *Id.* at 528–40. Dr. Mehar diagnosed "[b]ack disc disease" with symptoms of "pain; paresthesia lower back." *Id.* Dr. Mehar listed Motrin, steroid injection, and physical therapy under treatment and described Salisbury's prognosis as poor. *Id.* at 529. Dr. Mehar described Salisbury's "diff[iculty] walking[,] sitting[,] standing, lying [down]." *Id.* at 530; *see also id.* at 535 ("poor sitting [and] standing"). Dr. Mehar assessed lumbar spasm, citing the 2008 x-ray and MRI laboratory findings and noting that Salisbury was using a back brace. *Id.* at 530–31. Dr. Mehar further noted that both depression and fatigue were present, with the former secondary to the latter. *Id.* at 530; *see also id.* at 529. Dr. Mehar indicated that there was a significant abnormality in gait. *Id.* at 531. While Dr. Mehar indicated the presence of depression and poor mood and affect, he only wrote "ok" or checkmarked "speech, thought, perception"; all sensorium functions, including "attention and concentration," "orientation," "memory," "information," "ability to perform calculations, serial sevens, etc."; and "insight and judgment." *Id.* at 534. Dr. Mehar reported "no change" in Salisbury's activities of daily living. *Id.* at 535. Dr. Mehar also recorded that suicidal features were not present and that Salisbury was capable of handling any payment benefits. *Id.*

With respect to Salisbury's ability to do work-related physical activities, Dr. Mehar opined that Salisbury had a limited ability to lift and carry (no weight); limited ability to stand and/or walk (less than two hours per day); limited ability to

sit (less than six hours per day); limited ability to push and/or pull (none with respect to upper extremities); and postural limitations. *Id.* at 536. With respect to Salisbury's mental limitations, Dr. Mehar opined that Salisbury had no limitation with respect to understanding and memory; limited ability with respect to sustained concentration and persistence; no limitation with respect to social interaction; and no limitation with respect to adaption. *Id.* at 537. Dr. Mehar noted limited ranges in motion of the lumbar region of the spine (with respect to flexion-extension and lateral flexion) and of the ankle (regarding the plantar flexion). *Id.* at 540.

### b) Syed Hosain, M.D.—Treating Pain Management Physician

On March 6, 2010, Dr. Hosain wrote a letter to the Owen Law Firm in support of Salisbury's lawsuit regarding the motor vehicle accident, recounting the history of his injuries:

> Mr. Salisbury first consulted me on June 24, 2008 with complaints of low back pain following a motor vehicle accident on March 3, 2008. The patient told me that he had not suffered with such lower back pain prior to this accident. The patient told me that the pain was aching, throbbing and constant pain across low back. He denied any radiation of pain to the lower extremities. The patient told me that the pain was exacerbated by standing in one position for more than about 10 minutes or sitting in one position. He noticed that bending over and lifting more than 5 to 10 pounds weight also exacerbated his pain. The patient related to me that he had tried a course of physical therapy with no relief of his pain. He stated that rest was the only relieving factor for his pain. Patient also complained of sleep disturbance due to back pain.

*Id.* at 718–19. Dr. Hosain described his findings, diagnosis and prognosis:

> The pertinent findings related to the low back were diffuse tenderness across the low back. There was an absence of muscle spasm in the low back. Initially trigger points were not identified in the low back. The

sacroiliac joints were not tender on the left or right hand side.  My
initial diagnosis was that the patient was suffering from lumbago and
chronic lumbar strains.  His prognosis appeared fair.

*Id*.  According to Dr. Hosain: "It is my medical opinion that Mr. Salisbury's lower

back condition is likely to be very long lived if not permanent; I base this on the fact

that his condition has not improved in the past 20 months since he consulted me."

*Id*.  Dr. Hosain noted that Salisbury received trigger point injections at intervals of

one to two months.  *Id*.  Dr. Hosain further explained that his regular occupation

duties as a landscaper require him to bend frequently and lift heavy loads:

> The patient has been disabled from this occupation since the date of
> accident.  He remains disabled from this occupation at this time. . . .  It
> is my medical opinion that the claimant has a permanent disability. . .
> .  I consider the patient disabled as a result of the accident of March 3,
> 2008.  The basis of my medical opinion that the patient is disabled is
> the fact that he is limited in his ability to bend at his lumbar spine, his
> limitations with regard to lifting and his chronic lower back pain.  This
> pain has failed to resolve despite prolonged treatment including
> interventional pain management treatments and pharmacological
> treatments.

*Id*.

> Dr. Hosain provided another opinion on November 11, 2011:
>
> The above captioned patient is under my care for chronic myofascial
> pain of the back.  The patient was injured in a motor vehicle accident
> in 2008.  He has suffered with chronic lower back pain since that time.
> The patient has not been able to continue in his normal occupation as a
> landscaper.  He is unable to life more than about ten pounds weight
> without experiencing severe back pain.  The patient has to make
> frequent changes of position when sitting or standing.  The patient has
> increased with driving more than 30 minutes.  The patient has
> received treatments including trigger point injections with some
> limited and temporary relief of his pain.  He undergoes trigger point
> injections at intervals of about 2–3 months.  The patient has tried
> physical therapy with limited relief of his pain.  The patient's
> prognosis is guarded at this time; since he has not responded to

medical treatments or injections with resolution of his pain he may
continue to experience pain for at least many years. The patient is
likely to be unable to return to any physically demanding occupation.

*Id.* at 1052.

### c) Jeffrey Degan, M.D.—Examining Neurosurgeon

In July 2010, Salisbury consulted with neurosurgeon Jeffrey Degan, M.D., of

Hudson Valley Neurosurgical Associates LLC. *Id.* at 1009–11. "The first orthopedic

[Salisbury] went to said that there was no surgery for the damage and [he] just

wanted to get a second opinion." *Id.* at 74. Dr. Degan recorded the following

observation upon their initial meeting in a letter dated July 23, 2010 and addressed

to Dr. Mehar:

Since the accident, [Salisbury] has suffered from severe neck
and back pain. The worst of the pain is in the back itself. If the
patient sits or stands in one position, the pain comes on. It
recently has begun to radiate through the medial aspects of the
thighs and legs, down to the feet. It is worse in the right than
the left lower extremity. The pain also radiates up into the
cervical region. Separately, the patient has begun to experience
cervical pain radiating up into the occiput. There is associated
numbness and weakness of all four extremities. There have
been no bowel or bladder changes. Mr. Salisbury has tried
physical therapy and has had frequent cervical and lumbar
injections without last relief. . . .

His strength is full throughout the upper extremities except for
bilateral grips and interossei muscles, which are 4+/5. He is
also 4+5 throughout bilateral lower extremities. Sensation is
decreased to pinprick throughout the upper and lower
extremities. Reflexes are 1+ in the upper extremities and 2+ in
the lower extremities. Babinski and Hoffmann sighs are
negative bilaterally. The patient's gait is normal. He is able to
walk on his heels or toes. Tandem gait is intact. Romberg is
negative. . . .

I have discussed with Mr. Salisbury that I do not see any
surgical lesions on his imaging studies. Nonetheless, these
studies are over two years old at this point. Thus, I have
ordered new MRI scans of the cervical and lumbar spine. That
said, I think it is unlikely that Mr. Salisbury will have a surgical
lesion on these studies.

Nonetheless, given his symptomatology, I do think it is
important to rule out spinal cord compression in the cervical
region, and I will also re-evaluate his lumbar spine.

*Id.* at 1009–11.

On August 3, 2010, a new set of MRIs were taken of the lumbar and cervical

spine. *Id.* at 1012–13. As to the lumbar spine, there was no fracture or metastatic

disease. The paraspinal soft tissues were unremarkable. *Id.* at 1012 ("Impression:

1. Foraminal stenosis bilaterally at L5-S1. 2. Bilateral facet arthrosis at all levels.

3. Disc bulge at L1-L2 and L2-L3. 4. Bilateral facet arthrosis and there appears to

be a foraminal stenosis on the left at L4-L5."). Regarding the cervical spine, there

was no fracture or metastatic disease. The paraspinal soft tissues was normal. The

cervical cord and craniocervical junction were normal and homogeneous. *Id.* at

1013 ("Impression: Mild disc bulging at C5-C6.").

At Salisbury's August 13, 2010 follow-up appointment, Dr. Degan

documented his findings:

He has had no change in his symptomatology over the last few weeks.
He remains neurologically stable. I have reviewed electronically MRI
scans of the cervical and lumbar spine performed on August 3, 2010.
The cervical spine is essentially a normal study. The lumbar spine
study does demonstrate some degenerative changes and mild
neuroforaminal stenosis at L5-S1 and possibly LR-5 without nerve root
impingement. There are no lesions on Mr. Salisbury's MRI scans that
would be amenable to surgical correction. Therefore, I have
recommended that he continue to follow up with Dr. Hosain of pain

management.  Hopefully, Dr. Hosain will be able to find a medication or procedure that will alleviate Mr. Salisbury's symptoms.

*Id.* at 1007–08.

### d) Sunitha Polepalle, M.D.—Independent Medical Examiner

An independent medical examination was performed by Sunitha Polepalle, M.D., on behalf of Salisbury's insurer on October 3, 2008.  *Id.* at 668–70.  Dr. Polepalle concluded that his symptoms were causally related to the accident, and that his physical therapy, pain management, and MRI scan were all appropriate treatments.  *Id.*  Dr. Polepalle further reported that Salisbury received "Lidoderm patches, Aleve, and the antispasmodic, which [we]re all necessary to return the patient to preinjury status."  *Id.*  Dr. Polepalle diagnosed myofascial pain in the back and determined that his prognosis was good:

> The patient had a temporary impairment for approximately two months as a result of the injuries obtained in the March 3, 2008 accident. . . .  I believe that the patient is able to return to previous activities including his work and doing some housekeeping. . . .  The patient states that he has not reached preinjury status, however. . . .  I feel that the patient's condition has stabilized relative to the injury in the March 3, 2008 accident. . . .  I do not feel that the patient needs any further treatment with regards to the March 3, 2008 accident. . . .

*Id.*  Dr. Polepalle also noted: "The patient states that he has a history of depression and anxiety for many years which can affect his recovery from the conditions of his back pain due to myofascial pain."  *Id.*

### e) Rita Figueroa, M.D.—Consultative Surgeon

On February 27, 2017, Salisbury saw surgeon Rita Figueroa, M.D., for a consultative orthopedic examination.  *Id.* at 1823–26.  Salisbury reported the

following regarding his activities of daily living: "His wife Julie does the cooking, cleaning, laundry, and shopping because he has difficulty with standing for prolonged periods of time, bending, and lifting. No childcare, as the children are older and can take of themselves. He showers three times a week; he cannot do it daily because it is exhausting. He dresses every day. He watches TV." *Id.* at 1824.

Upon physical examination, Dr. Figueroa noted a normal gait and station, an ability to walk on heels and toes without difficulty, an inability to squat, no use of an assistive device, no need for assistance changing for the exam or getting on and off exam table, and ability to rise from chair without difficulty. *Id.* at 1825. With respect to the cervical spine, Dr. Figueroa noted the following ranges of motion: full flexion, full extension, full lateral flexion, and rotary movements 40 degrees bilaterally. *Id.* Dr. Figueroa found no cervical or paracervical pain or spasm and no trigger points. *Id.* With respect to the thoracic and lumbar spines, Dr. Figueroa noted the following ranges of motion: flexion 30 degrees, extension 5 degrees, full lateral flexion, and full rotary movements bilaterally. *Id.* Dr. Figueroa found tenderness along the right lower back but no [sacroiliac] joint or sciatic notch tenderness, no spasm, no scoliosis or kyphosis, and no trigger points. *Id.* Salisbury tested positive for straight leg raising (right 45 degrees, left 50 degrees), but it was not confirmed in the sitting position. *Id.* Dr. Murphy diagnosed lumbago with radiculopathy, among others, and assessed a fair prognosis. *Id.* at 1826. Dr. Murphy opined that Salisbury had moderate limitations to repetitive bending, lifting, and carrying. *Id.*

Dr. Figueroa also completed a medical source statement regarding Salisbury's ability to do work-related activities (physical). *Id.* at 1827–32. According to Dr. Figueroa, Salisbury could lift/carry up to ten pounds continuously and 11–20 pounds occasionally, but never more than 20 pounds; he could sit, stand, and walk 30 minutes each at a time without interruption; and he could sit, stand, and walk three hours each in total in an eight-hour workday. *Id.* at 1827–28. Dr. Figueroa indicated that he sometimes required the use of cane to ambulate for long distances. *Id.* Without a cane, he could ambulate 400 feet. *Id.* The use of a cane was medically necessary, but with a cane, he can use his free hand to carry small objects. *Id.* He was able to use his hands for reaching, handling, fingering, feeling, and pushing/pulling continuously, and his feet for the operation of foot controls occasionally. *Id.* at 1829. Salisbury was able to climb, balance, stoop, kneel, crouch, and crawl continuously. *Id.* at 1830. Dr. Figueroa opined that these limitations lasted or will last for 12 consecutive months. *Id.* at 1831.

### ii. Mental Impairment Assessments

#### a) Todd Rochman, M.D.—Treating Psychiatrist

On November 15, 2011, Dr. Rochman completed a mental impairment assessment. *Id.* at 1053–56. Dr. Rochman reported that he saw Salisbury every other month for 20 to 30 minutes. *Id.* at 1053. Dr. Rochman diagnosed him with major depressive disorder and assigned him a current GAF score of 48. *Id.*[11] Dr.

---

[11] "The GAF is 'a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning,' and runs from 0 to 100." *Maldonado v. Berryhill*, No. 16-CV-165 (JLC), 2017 WL 946329, at *8 n.21

Rochman noted a marginal response to pharmacological efforts, anhedonia, low motivation, limited energy, sleep disturbance, and that his medications prevented suicidal thoughts. *Id.* Salisbury had been prescribed Zoloft and Abilify. *Id.* Dr. Rochman's clinical findings included sleep disturbance, poor concentration, low energy, not motivated, hopeless, helpless. *Id.* He assessed a guarded prognosis. *Id.* Dr. Rochman described Salisbury as having the following symptoms: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; blunt, flat or inappropriate affect; poverty of content of speech; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; apprehensive expectation; memory impairment—short, intermediate or long term; sleep disturbance; and emotional withdrawal or isolation. *Id.* at 1054.

Dr. Rochman opined that Salisbury had a moderate restriction of daily living; extreme difficulties in maintaining social functioning; marked deficiencies of concentration, persistence or pace; and one or two repeated episodes of decompensation within a 12-month period, each of at least two weeks duration. *Id.* at 1055. Dr. Rochman also indicated that Salisbury has a "medically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at

---

(S.D.N.Y. Mar. 10, 2017) (quoting *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011)). "A score of 41–50 indicates serious symptoms, a score of 51–60 indicates moderate symptoms and a score of 61–70 indicates some mild symptoms or some difficulty in social or occupational functioning . . . ." *Cabrera v. Berryhill*, No. 16-CV-4311 (AT) (JLC), 2017 WL 3172964, at *3 (S.D.N.Y. July 25, 2017), *adopted by* 2017 WL 3686760 (Aug. 25, 2017) (citing *Maldonado v. Colvin*, No. 15-CV-4016 (HBP), 2017 WL 775829, at *5 (S.D.N.Y. Feb. 28, 2017)).

least two years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support"; and a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." *Id.* Dr. Rochman anticipated Salisbury's impairments or treatment would cause him to be absent from work for more than four days per month. *Id.* at 1056. Dr. Rochman opined that Salisbury's impairment lasted or can be expected to last at least 12 months and denied that Salisbury was a malingerer. *Id.*

### b) Alison Murphy, Ph.D.—Consultative Psychiatrist

Salisbury saw Alison Murphy, Ph.D., for a consultative psychiatric evaluation on February 1, 2017, for the purposes of this claim for disability benefits. *Id.* at 1813–17. Upon mental status examination, Dr. Murphy noted the following about Salisbury: cooperative demeanor and responsiveness to questions; adequate manner of relating, social skills, and overall presentation; appeared same as age; casual dress, somewhat disheveled, and unkempt; poorly groomed; normal posture; normal motor behavior; appropriate eye contact; fluent intelligibility; clear quality of voice; adequate expressive language; adequate receptive language; coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in evaluation setting; affect of full range and appropriate in speech and thought content; neutral mood; clear sensorium; fully oriented; intact attention and concentration; impaired

memory skills due to emotional distress resultant to current psychiatric disorder; average cognitive functioning; and fair to poor insight and judgment. *Id.* at 1814–15.

> Regarding daily living,
>
> The claimant said he can dress, bathe, and groom himself independently. He says due to pain and lack of motivation he cannot cook, do the cleaning, do the laundry, or go shopping. He said his wife does the cooking, the cleaning, the laundry, and the shopping as a result. He said he does not manage money effectively. His wife manages the money. He said he can drive independently. He does not take public transportation as he does not have the need to do so. Socialization: He doesn't have many friends. Family relationships: Stressed and strained. Hobbies and interests: He said he doesn't have many at the present time. The claimant spends most of his days with his children.

*Id.* at 1815–16.

Dr. Murphy found no evidence of limitations in following and understanding simple directions and instructions; no evidence of limitations in performing simple tasks independently or needs supervision; no evidence of limitations in maintaining attention and concentration; marked limitation in the ability to learn new tasks; marked limitation in the ability to perform complex tasks independently and need supervision; mild limitation in ability to make appropriate decisions; mild limitation in relating adequately with others; and no evidence of limitations in appropriately dealing with results. *Id.* at 1816. According to Dr. Murphy, "[t]he results of the present evaluation appear to be consistent with psychiatric problems that may significantly interfere with the claimant's ability to function on a daily basis." *Id.* Dr. Murphy diagnosed unspecified depressive and anxiety disorder, assessed a fair

prognosis, and recommended that Salisbury continue with psychiatric treatment as currently provided, individual psychological therapy, and vocational training. *Id.*

That same day, Dr. Murphy also completed a medical source statement of ability to do work-related activities (mental). *Id.* at 1818–20. Dr. Murphy opined that Salisbury's ability to understand, remember and carry out instructions was affected by his mental impairment. *Id.* at 1818. Specifically, while he had no limitations understanding, remembering, and carrying out simple instructions, or making judgments on simple work-related decisions, Salisbury was mildly limited in his ability to make judgments on complex work-related decisions and markedly limited in his ability to understand, remember, and carry out complex instructions. *Id.* According to Dr. Murphy, he "demonstrated a markedly limited ability to learn new tasks and to perform complex tasks independently or need[ed] supervision." *Id.*

Dr. Murphy also opined that Salisbury's ability to interact appropriately with supervision, co-workers and the public, as well as to respond to changes in the routine work setting, were affected by his mental impairment. *Id.* at 1819. Specifically, he was mildly limited in his abilities to interact appropriately with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting and markedly limited in his ability to interact appropriately with the public. *Id.* According to Dr. Murphy, Salisbury owned a landscaping company prior to his motor vehicle accident, after which he experienced chronic pain as a result, became very depressed, and withdrew from the public. *Id.*

33

### c. Non-Medical Evidence

#### i. A. DelNero—SSA Single Decisionmaker

On April 29, 2009, SSA Single Decisionmaker A. DelNero assessed Salisbury's residual functional capacity for purposes of his disability claim. *Id.* at 634–39. Regarding exertional limitations, Salisbury was found to be able to occasionally lift and/or carry 20 pounds and frequently lift and/or carry ten pounds; sit about six hours in an eight-hour workday; and no limitation with respect to the ability to push and/or pull. *Id.* at 635. Regrading postural limitations, Salisbury could occasionally climb, balance, stoop, crouch, and crawl, but frequently kneel. *Id.* No manipulative, visual, communicative, and environmental limitations were established. *Id.* at 636–37. In explaining the discrepancy between Dr. Mehar's conclusion and his/her own, DelNero stated: "Dr. Mehar stated that the claimant can lift 0 lb, sit for less than 6 hours per day and stand for less than 2 hours per day. A Stieberger clarification letter was sent to this physician. He responded with progress notes that provide little in the way of objective findings. The [treating physician's] [medical source opinion] is not consistent with the available medical evidence and is not given controlling weight." *Id.* at 638.

#### ii. Julie Salisbury—Spouse

By affidavit dated November 21, 2011, Julie Salisbury provided a statement, which, in part, described her husband's inactive role in the business:

> Although my husband has the desire to work the business, he does not have the ability to do so. He has not taken part in the business in any way since the accident due to the injuries he sustained and from the depression from which he suffers and I witness on a daily basis. As

time went on and I realized that my efforts to maintain the business were fruitless as I was investing valuable time into a losing proposition, the business was closed in October 2011 in order for me to devote my time to the care and well-being of my husband and children.

*Id.* at 326 (formatting altered).

By affidavit dated April 6, 2018, his wife provided an additional statement:

The accident of March 3, 2008, completely changed Micah's life, my life, and our family life. Shortly after the accident I delivered twins and Micah was unable to help care for them. Micah was unable to work the landscape business and we closed the business down. Closing the business has spiraled him further into depression as he felt he had failed us as a provider for our family. It was very difficult to get him to go to doctor's appointments, and/or to speak to anyone. When he finally did get medical help, it only provided him with temporary relief. Micah is in a constant cycle of pain, sleeplessness and depression, all resulting from the accident of March 2008. . . .

Since the accident there has been a big shift in our relationship and I find myself to be a 'single' parent of three children. I ask a lot of help from friends and family as we cannot afford childcare and Micah is not able to help me. Micah no longer wants to go out anywhere, he is sullen and detached. His depression not only isolates him, but as a result isolates me as well. The stress of all of this on our marriage has been great, and there is resentment. . . .

Micah is in so much pain that he does not sleep through the night. He tosses and turns and gets up frequently, which leads to exhaustion the next day. Micah cannot do household chores. Washing dishes and cooking are difficult because he cannot bend over or stand for any length of time. Micah cannot empty the garbage or change a load of laundry as he cannot lift. When we can afford it, we hire outsiders to do the household repairs and yard work. If we need heavy lifting or moving done around the house, we ask neighbors to help. Micah can shower and dress himself, but it takes much longer. Showering is physically exhausting for him, so he does not shower as often as he should. Micah dresses in steps and has to rest in between putting on his pants, shirt, shoes, etc. He has difficulty bending and lifting his legs/feet to put on pants and shoes and socks and difficulty reaching overhead to put on a shirt. Micah has a recliner that helps to relieve some of the pressure in his back, but can only sit for approximately 30 minutes before having to shift position and get up. Walking is difficult

for Micah.  He can walk approximately a city block before he needs to rest for about five to ten minutes.  Sometimes he will come to the mall with me and the kids just to get out.  He sits on a bench while we do all the shopping we need to do, then we pick him up when we are finished and ready to go home. . . .

Micah's memory is very poor.  He has difficulty scheduling and remembering appointments, picking up medication, taking medication, and what the doctors tell him at the appointments. . . .

He has had very little relief from treatment and has resigned himself to living in a state of constant pain, therefore he doesn't talk about the pain.  Micah gets little relief of depression and constant pain despite various treatments.  He has stopped his treatments for periods as he felt he was getting nowhere.  Additionally, there are times when we cannot afford the treatment he needs.  This has caused gaps in his treatment history.  We have come to realize, ten (10) long years later, that we have a new "normal" that includes a man that is totally different than the man prior to March 2008.

*Id.* at 1626–29 (formatting altered).

### 3.    ALJ Hearings

#### a.    The 2010 ALJ Hearing

On July 28, 2010, Salisbury, represented by counsel, appeared before ALJ Katz in White Plains.  *Id*. at 95–119.  He began his testimony by explaining that he was involved in a motor vehicle accident on March 3, 2008 that rendered him unable to work.  *Id.* at 98.  Salisbury "was stopped waiting for a school bus to unload kids and a guy from behind rear ended [him]."  *Id.*  Asked about the cane with which he arrived at the hearing, Salisbury explained that his "pain management doctor prescribed it probably about eight months ago" because his condition has "gotten worse" in the form of "radiating and shooting pains" that he

did not experience previously. *Id.* at 98–99. The pain travelled "to [his] legs and up the back of [his] neck into [his] head." *Id.* at 99.

In describing the medical treatment that he had been receiving, Salisbury reported that he had "had physical therapy, aqua therapy, and . . . continuing pain management treatment." *Id.* at 103. Salisbury clarified that Dr. Mehar "doesn't do anything for the treating of that. . . . He's [his] primary." *Id.* Salisbury "just see[s] him every three months for [his] regular stuff." *Id.* Rather, Salisbury pointed to Dr. Hosain as being in the best position to discuss his medical problems related to his back. *Id.* at 104.

Salisbury explained: "I went through a physical therapy regimen and 16 weeks of aqua-therapy and suffered all their different treatments and nothing was working." *Id.* at 106. Salisbury described his lower back pain and stated that "[i]f [he] sat for more than 15 or 20 minutes it would start to make [his] legs numb and the longer [he] sat the worse [the pain] would get . . . ." *Id.* He stated that he could stand for "[n]ot more than 15, 20 minutes" and walk for no more than ten to 15 minutes. *Id.* at 107. Salisbury stated that he "could walk to the end of [his 100-foot] driveway but [he] would have pain." *Id.* at 108. However, he testified that he did not walk the driveway or do anything at all because "[e]ven if [he] tried to do something [he] couldn't do anything for a very long time afterwards." *Id.* "It would take what [he] had left and then [he] would have to lay down and take it easy for the rest of the day." *Id.*

Salisbury described his self-employment as a landscaper prior to the accident. *Id.* He reported working six to eight hours a day, five to six days per week and, at one point, netting around "$16,000, $17,000" over a calendar year. *Id.* at 100. The business was "doing alright" prior to the accident, but following the accident, he was "not making the money that [he] used to and [he] just [could not] be there to oversee things that are done the way [he] like[d] them." *Id.* at 116. As a result of the accident, his wife became responsible for the family's financial needs while Salisbury "had to hire somebody to take over [his] responsibilities" to continue running his landscaping business. *Id.* at 99–100. Salisbury denied performing any work for the business; his wife continued to handle the administrative side. *Id.*

Salisbury discussed his history of depression: "[I]n the beginning of [2004] my father had passed and then I had been fired from a job that I had for a long time with no notice and they diagnosed me with depression. It was treated by—well, I took Wellbutrin—. . . up until that time and the Wellbutrin helped." *Id.* at 111. He had received unemployment compensation from approximately January to June of 2005 before starting the business in September. *Id.* at 112. Salisbury explained that his mental illness prevented him from working: "I can't concentrate. On bad days I get withdrawn and I don't want to talk to anybody. And it's debilitating to me. I can't provide for my family." *Id.* at 113. He also has trouble sleeping: "If I don't take the Ambien I don't sleep at all. The Ambien probably gives me about three or four hours straight of sleep and then I[] probably wake up every 45 minutes [be]cause I'm in pain and I have to rotate." *Id.* This causes him to be tired the

following day.  *Id.* at 113–14.  Salisbury testified that he began seeing Dr. Rochman at EOPA in 2009.  *Id.* at 111.  Salisbury reported still seeing Dr. Rochman about once a month for medication management, whereas he would see a social worker at EOPA every two to three weeks for the verbal portion of his treatment.  *Id.* at 114.

Salisbury testified that he was not in a position to work between the time of the accident in March 2008 through the date he was last insured in December 2008: "The injury, the pain side of I would have kept me from working.  The depression is just added on."  *Id.* at 117.  Before the accident, he was able to lift/work with "[t]rees and equipment and shrubs, mulch, dirt," but after the accident, "[his] muscles all atrophied.  [He could] hardly open a jar of pickles."  *Id.* at 117–18.

There was no further questioning and no other witness.

### b.  The 2011 ALJ Hearing

On remand by the Appeals Council for further consideration, ALJ Katz held another hearing with Salisbury and his counsel in White Plains.  *Id.* at 60–94. When asked what had transpired since the previous hearing, Salisbury testified: "I have the same problems maybe getting a little bit worse.  I've been basically just stay[ing] at home."  *Id.* at 63.  Salisbury also clarified that he had closed the business in October 2011.  *Id.* at 70–71.  His wife had been operating the business at night while she was teaching, and Salisbury "had to pay somebody to do the actual work."  *Id.* at 71.

Salisbury testified that before the accident, he was doing fine; although he had been suffering from depression, he was still able to do his job.  *Id.* at 75.  After

the accident, however, the depression got worse. *Id.* at 75–76. "Initially it was the pain from the back injury and then probably a few months into it, you know, [be]cause everybody was saying that this was only going to be a couple of weeks thing— . . . so I'm probably three or four months into it and then, you know, it's getting worse and I still had all the things I originally did and it's starting to look like that, you know, this is going to be a permanent injury. So I was getting kind of depressed about not being able to provide for my family and the fact that I was going to have to live with this pain for the rest of my life." *Id.* at 76.

Salisbury testified that his depression impacts his ability to work because he could not concentrate and feels hopeless. *Id.* at 63–64. He reported having difficulty concentrating on "[r]eally about any task that [he had] to do continually." *Id.* at 64. He was able to watch a football game and drive a car. *Id.* He was also able to care for his three children, one six-year-old and three-year-old twins, while his wife works as a teacher. *Id.* at 64–65 ("I do it because I have to. I don't know if I should be doing it. There's no plan B."). Salisbury reported suffering from depression before the accident and taking Wellbutrin for it, as prescribed by his primary care physician. *Id.* at 66–67. The depression began when his father "had died in January and then that December I had lost a job that I had had for five years with no notice. And I actually went to the hospital because I was vomiting uncontrollably. . . . which ended up being the depression showing itself." *Id.* at 67–68. He had been taking Wellbutrin for quite some time, but "[w]hen [he] started going for regular treatment they took him] off it [and] put [him] on something

different. . . . [bec]ause it was not working anymore." *Id.* at 68. He testified that he was now taking Zoloft and Abilify, as prescribed by Dr. Rochman. *Id.* at 68. Salisbury repeated that he had been seeing Dr. Rochman consistently since 2009 "[p]robably about once every two months," although he goes into his office "[p]robably about every two to three works" to talk to a social worker there. *Id.* at 69. "We basically just talk about stuff that's bothering me and she tries to help me figure it out." *Id.* at 73. Dr. Rochman "just does meds" but reviews the social worker's notes. *Id.* at 74.

Salisbury described how any pain he experiences also affects his ability to focus. *Id.* at 77. "I just block everything out. People talk to me and I don't respond." *Id.* He rated his pain on an average day, on a scale from one to ten, to be an "[e]ight or nine." *Id.* When asked by his attorney whether his pain ever achieves a ten, "ten being you've got to take me to the emergency room," Salisbury replied "[a]bout three times a week," but he does not go to the ER because "it's just not an option." *Id.* Instead, he "[t]akes pain meds and go[es to] lay down." *Id.* at 78. Laying down horizontally "on my back so there's no pressure" for "[a]bout an hour" appears to do the trick. *Id.* Salisbury confirmed that he has had to do this prior to his date last insured. *Id.*

Summarizing Salisbury's past relevant work experience, vocational expert Darren Flemburg identified his previous employment as emergency medicine technician, which is medium strength and skilled; landscaper, which is heavy strength and unskilled; loss prevention worker, which is light and semi-skilled, and

truck driver, which is medium strength and semi-skilled. *Id.* at 80. When asked by the ALJ in what way he managed other people, Salisbury testified that he was hiring people to do landscaping for him. *Id.* at 82. He then clarified that "[m]y wife did all the calls and she actually worked with the people." *Id.* at 83. When asked whether he was unable to take a call and work with people, Salisbury testified, "I had no interest in calling people back." *Id.* In light of Salisbury's responses to the ALJ's questions, the vocational expert declined to amend his testimony "because it sounds like although he owned a business he didn't necessarily run it." *Id.* at 83– 84.

The ALJ then posed the following residual functional capacity question to the vocational expert: "Let's suppose we have someone of the claimant's age, education, and work experience and let's say that person is able to sit for six hours and stand and walk for four hours during the course of a typical eight hour work day and let's assume further that person is able to lift and carry items weighing 10 pounds. Further assume the person cannot perform highly aerobic activity and is limited by emotional impairment to the extent where he can only perform basic unskilled work tasks that do not require, you know, substantial concentration." *Id.* at 84. The ALJ confirmed that such a person is a sedentary unskilled worker and the relevant region is the Poughkeepsie-Middletown-Newburgh area. *Id.* The vocational expert identified the following jobs: surveillance system monitor, table worker, and telephone quotation clerk. *Id.* at 84–88. With respect to the surveillance system monitor, the vocational expert cautioned "that because of the area you're talking

about the number of jobs may actually be limited in their numbers. . . . In other words there . . . would be fewer jobs in this area than, let's say, the White Plains area or the New York City area or even in the Albany area. . . . So in the area we're talking about there would be 60 of these [surveillance system monitor] jobs," *id.* at 85, whereas nationally, "there would be 8,278." *Id.*

The vocational expert generally cautioned: "I think a big issue you're going to find, Your Honor, is that because of the area and just in general there's very little demand in the economy for sedentary unskilled work. Unskilled work at the sedentary level makes up only a half of a percent." *Id.* at 88–89. Although "there are [] 130 sedentary skilled occupations[] [p]er the DOT," *id.* at 89, "the vast majority of those jobs are in production and manufacturing . . . . [w]hich simply is an industry that has been on the decline rapidly year after year. It's becoming less and less prevalent. That's my understanding. Very few clerical jobs, Your Honor, are unskilled. They're almost all sedentary but they're also almost entirely at least semi-skilled." *Id.* These jobs require "[t]ypically some on the job training." *Id.*

Salisbury's attorney then asked the vocational expert whether "the limitation on the ability to focus, to remain on task, negate any of these jobs." *Id.* at 90. The vocational expert testified that "the ability to focus is generally an important part of almost any job." *Id.* Quantifying this limitation, the attorney posed the following hypothetical: "So I'm thinking [of] a person with an inability to focus which also has difficulty thinking and concentrating, is emotionally withdrawn, has memory impairment, I think that would, you know, if we were to put five percent off-task on

all of those, I think some of those would be overlapping we couldn't just do the math and come up with 20 or 25 percent off-task but I think, would it be reasonable to say given those limitations 15 percent off-task. So if the person was 15 percent off-task?" *Id.* The vocational expert testified: "I would think that would have a negative impact . . . . [o]n any job, really." *Id.* at 90–91. A person would be unable to do not only the jobs listed, but "with those limitations, I think, it would be difficult for him to do any job." *Id.* at 91. When asked about "[a] person that would be absent from work four to five times a month," the vocational expert replied, "That would be a problem [be]cause although, Counselor, jobs do allow for time off from work . . . that type of being off of work on a regular basis would make maintaining employment impossible. . . . If you had to call in sick once a week, every week, . . . you probably would not have any job very long." *Id.*

### c.  The 2018 ALJ Hearing

On April 30, 2018, Salisbury, represented by counsel, appeared in Goshen, New York, before ALJ Singh in White Plains, by video. *Id.* at 1089–118. Salisbury again clarified that his business continued for "about a year and a half after the accident" before he dissolved it. *Id.* at 1096. "My wife ran the – like the administrative side, and we have to pay somebody to do the physical labor. . . . So, we let it go in a year and a half and we were just breaking even, so it didn't really make any sense to continue." *Id.* When asked what he did during the time period prior to the business being closed, Salisbury replied, "I was at home. I didn't do anything. I had somebody who ran my lawn cutting and he had a couple helpers,

and then I would just pay him." *Id.* When probed, Salisbury confirmed that he did

not do anything for the business—"[n]ot even any clerical, answering the phones,

anything like that." *Id.* at 1097. Salisbury clarified again that "Dr. Mehar was [his]

general practitioner . . . . He just took care of my regular every day stuff. He didn't

actually ever really treat me for it. The only time he saw me was when I went to

the ER they said to do a follow-up with your doctor in three days and that visit was

the only time that I saw him for this . . . ." *Id.* at 1097.

> Salisbury recounted his history of depression:

> The depression started when . . . within a very short time I lost my
> longtime job and my father passed. . . . Right after he passed I was
> actually showing sign[s] – I was vomiting uncontrollably. . . . And it
> turned to a week. So I went to the hospital. I did a day or two, stayed
> over, and my wife had talked to the doctor who was seeing me in the
> hospital and said that I was having some problems with exhaustion,
> and I guess it turns out that this was the depression's manifestation
> was making me throw up or something. . . . I didn't leave my house for
> 90 days after that hospital stay. . . . I was just staying in bed. Didn't
> want to get out. It was a lot of stuff that put a lot of stress on my wife.

*Id.* at 1098–99. When asked about treatment for his mental impairment, Salisbury

testified that he began receiving mental health treatment with EOPA in 2005. *Id.*

at 1098.[12] At EOPA, Dr. Rochman gave Salisbury "depression meds and I think it

was with him that I started taking the Ambien for sleep." *Id.* at 1100. Salisbury

also described doing counseling with an unidentified professional "in the same

building. *Id.* "Dr. Rochman was just – he did the med part of it and she did – we

---

[12] Although Salisbury testified at this hearing that he started at EOPA in 2005, the
record—and later Salisbury himself—confirms that he did not begin receiving
treatment there until 2009.

45

actually did the talking – what we talked out." *Id.* While he did not find this therapy component to be helpful, he testified that "[t]he meds did help. We've had to change them around a few times since then because things change, but yeah, no, the talking didn't help me. It actually just ended up giving me more anxiety." *Id.* at 1101. He was not certain whether any of the medications caused side effects. *Id.* However, regarding their efficacy, Salisbury testified: "I think the meds just sustained whatever I'm doing now." *Id.* at 1102.

Salisbury then discussed his daily routine. *Id.* at 1101–02. "I try to get . . . a nap in before the kids come home from school because it's the only way I'm – if I don't get a nap. I'm done. By like 5:00 I'm ready for bed. . . . It's just I'm . . . . in so much pain throughout the day that I just have to lay down and get recharged a little bit." *Id.* at 1101. Salisbury also testified: "I would change [the children], put them down for a nap. It was basically either nap or in the swing. . . . And that's – luckily they were okay with that. . . . I napped when they napped. . . . So – and then I just had a monitor." *Id.* at 1102.

Regarding his physical limitations during the disability period, Salisbury reported in the present tense: "I can't really stand for too long. I can't walk for too far. I have to take a lot of breaks if I do something. And then . . . if I do, do something, it has repercussions. Like for days I'll be in bed because my ba[ck] is all – is bad." *Id.* at 1104. As to how much weight he was able to comfortably lift and carry during that time period, Salisbury again appeared to answer in the present tense, replying "10, 15 pounds"; when prompted by his attorney about the relevant

time period, Salisbury remarked, "I'm not sure.  I don't think it was much at that time.  It was right after the accident."  *Id.*  As to sitting, Salisbury testified: "It depends.  I have a recliner."  *Id.*  When his attorney again reminded him that the question was about the relevant time period, Salisbury stated: "I spent a great – a majority of the time laying down. . . .  If I had to sit [] the how long [] would depend on what kind of chair it was. . . .  If it was something that slight[ly] tilted backwards and maybe could recline a little bit, maybe a little longer, then – like these chairs are hard back, so it's going to start to bother me."  *Id.* at 1105.  With respect to standing and walking, Salisbury testified: "Standing probably 15 minutes.  Walking . . . a couple football fields."  *Id.*  The ALJ explained to Salisbury that "if what you're saying today doesn't actually – is not, you know, similar to what you said in the past," due to the passage of time, it would not be held against the claimant.  *Id.* at 1106.

Regarding his mental limitations, Salisbury testified: "My memory's really bad.  I don't know if it's an official diagnosis.  I remember at one point somebody saying I had traumatic amnesia, like I don't remember a lot of things like from my childhood."  *Id.* at 1106.  When pressed by the ALJ about how this inability to remember affected him and his daily activities during the relevant period, Salisbury insisted that such a limitation affected him "back then" but gave an example from his current situation: "I'm just forgetful.  That's one of the reasons why now I only go to the one doctor and she treats me for all of my problems because I would just

forget about appointments or I wouldn't feel like going, so I'd just stay home. It just makes it a little bit easier since I have one now." *Id.* at 1107.

When asked what specifically "kept [him] from being able to continue on with [his] business," Salisbury testified:

> At that time I had no desire to continue with the business. I just was in bed all the time [because . . . m]y back hurt and I had depression. . . . If I do anything for too long I start to have pain and it radiates. . . . It was just hard to do anything. And then, I think at that point then the depression and the back pain started working with each other . . . because you get to the point where you realize that, you know, you're not going to be able to provide or whatever.

*Id.* at 1108–09.

The ALJ then commenced questioning vocational expert Linda Stein. *Id.* Stein classified Salisbury's past work as a garbage collection driver, which is a semiskilled position at a medium exertional level, and a landscaper, which is a skilled position at a heavy exertional level. *Id.* at 114. The ALJ then posed the following hypothetical: "[A]ssuming an individual of the same age, education, and past work experience as the claimant is limited to a sedentary exertional level. I am including a sit/stand option, which I'm going to define as after every two to three minutes having to stand up at the work station for a minute to shift positions and sit back down, not leaving the workstation and not being away from the workstation or being off task. Can never climb ladders, stoop, kneel, crouch, and crawl, is limited frequently to pushing and pulling with the upper extremities, and is further limited to understanding, remembering, and carrying out simple, routine, repetitive, non-complex tasks." *Id.* at 1114. The vocational expert testified that

based on these limitations, the hypothetical individual could not perform Salisbury's past relevant work. *Id.* However, when asked by the ALJ whether there would be any other jobs in the national economy that such an individual could perform, the vocational expert listed the following occupations: table worker; surveillance system monitor; and charge account clerk. *Id.* at 1114–15.

The ALJ then posed an additional hypothetical to the vocational expert: "assuming the same limitations that I stated in the prior hypo, but now an individual would need to take extended breaks outside of the normal eight-hour breaks, which would result in an individual being off task for more than 15% of a workday." *Id.* at 1115. The vocational expert opined that no such individual could perform any of the past relevant work or any jobs, as "15% off task . . . is going to preclude all full-time gainful employment." *Id.*

## II.     DISCUSSION

### A.     Legal Standards

#### 1.     Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.*" DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the calculation of benefits, rather than for further administrative proceedings. "In . . . situations[ ] where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the court has] opted simply to remand for a calculation of benefits." *Michaels v. Colvin*, 621 F. App'x 35, 38–39 (2d Cir. 2015) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)) (internal quotation marks omitted). The court may remand solely for the calculation of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless." *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382(c)(a)(3)(A). Physical or

mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382(c)(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a.    Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the

claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.     Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted). A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted)

(alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also Burgess*, 537 F.3d at 129; 20

C.F.R. § 404.1527(c)(2). "An ALJ's failure to 'explicitly' apply the Burgess factors

when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96

(quoting *Selian*, 708 F.3d at 419–20). If, based on these considerations, the ALJ

declines to give controlling weight to the treating physician's opinion, the ALJ must

nonetheless "comprehensively set forth reasons for the weight" ultimately assigned

to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's

opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R.

§ 404.1527(d)(2)). The regulations require that the SSA "always give good reasons

in [its] notice of determination or decision for the weight" given to the treating

physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration

in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand

[cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*,

2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third

alteration in original) (internal quotation marks omitted).

### c.    **Claimant's Credibility**

An ALJ's credibility finding as to the claimant's disability is entitled to

deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006

WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the

Secretary's findings are supported by substantial evidence, the court must uphold

the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3.

[f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

**B.    ALJ Decisions**

**1.    The 2010 ALJ Decision**

On September 26, 2010, ALJ Katz issued a written decision concluding that Salisbury was not disabled through the date last insured.  AR at 124–32.  As a threshold issue, Salisbury was found to have last met the insured status requirements on December 31, 2008.  *Id.*  At step one, the ALJ determined that Salisbury did not engage in substantial gainful activity during the relevant disability period.  *Id.*  The ALJ found, at step two, that through the date last insured, Salisbury's spinal impairment and obesity were severe.  Id.  Salisbury's depression was found not to be severe because there was no objective documentation in corroboration thereof "on or prior to the date last insured."  *Id.* at 127–28.  Salisbury's hypertension, diabetes mellitus, and ulcerative colitis were also found not to be severe.  *Id.*  None of Salisbury's impairments, singly or in combination, were found to meet or equal a listing at step three.  *Id.*

The ALJ determined that Salisbury had "the residual functional capacity to perform a full range of sedentary exertion level work" with "the ability to sit for 8 hours and stand/walk for 4 hours during the course of an 8-hour workday; and he was able to lift/carry items weighing ten pounds"; but was not able to "perform highly aerobic activity." *Id.* The ALJ's RFC determination was based on the following weight assignment of medical opinions:

> The undersigned has given greater evidentiary weight to the evaluations of Dr. Polepelle and Dr. Hosain, whose opinions were expressed in more narrative format, as opposed to the "check-off" format employed by Dr. Mehar – who [ha]s not explained the basis for his evaluations – particularly his inconsistent evaluations of the claimant's ability to perform sedentary activities. The evaluations of Dr. Polepelle and Dr. Hosain are also more consistent with the objective medical evidence, which does not establish an objective basis of the sort of debilitation expressed by Dr. Mehar (e.g., unable to lift/carry anything). Dr. Hosain and Dr. Mehar are both treating physicians; however, Dr. Hosain is the claimant's pain management doctor (Dr. Mehar is said to be his general primary doctor, but is not involved in his pain management), so that physician is in a better position to evaluate the claimant's functional capacity.

*Id.* at 130. In light of this RFC determination, the ALJ found, at step four, that Salisbury was unable to perform any past relevant work. *Id.* at 131. However, at step five, considering his age, education, work experience, and residual functional capacity, the ALJ determined that the Medical-Vocational Guidelines directed a finding of "not disabled," as there were jobs that existed in significant numbers in the national economy that Salisbury could have performed. *Id.* Thus, the ALJ concluded that Salisbury was not under a disability from at any time from March 3, 2008, the alleged onset date, through December 31, 2008, the date last insured. *Id.* at 132.

## 2. The 2012 ALJ Decision

On January 17, 2012, ALJ Katz rendered another written decision following remand from the Appeals Council, again concluding that Salisbury was not under a disability during the relevant period. *Id.* at 40–53. At the outset, the ALJ noted that "[i]n its remand order, the Appeals Council requested the ALJ to re-contact treating physician Dr. Mehar for further explanation of his evaluations and to re-consider the opinions of Dr. Levin." *Id.* at 40. In a footnote, ALJ Katz explained that his office "attempted to get further information concerning Dr. Mehar's evaluation" but "was advised that Dr. Mehar had retired." *Id.* (citations omitted). The ALJ's findings concerning the first three steps did not change: (1) Salisbury did not engage in substantial gainful activity during the period from his alleged onset date of March 3, 2008 through the date last insured of December 31, 2008; (2) through the date last insured, Salisbury's spinal impairment and obesity were severe but his mental impairment, hypertension, diabetes mellitus, and ulcerative colitis were not; and (3) Salisbury did not have an impairment or combination of impairments that met or medically equaled a listing. *Id.* at 43–47.

Similarly, prior to step four, the ALJ determined a nearly identical residual functional capacity. *Id.* at 47. According to the ALJ, Salisbury had "the residual functional capacity to perform a full range of sedentary exertion level work" with "the ability to sit for 8 hours and stand/walk for 4 hours during the course of an 8-hour workday; and he was able to lift/carry items weighing 10 pounds. Despite his back impairments, he is able to bend occasionally (i.e., one-third of the time during

a typical work day). The claimant was not able to perform highly aerobic work activity due to his overweight condition." *Id.* This RFC determination was based on the same reasoning as in the earlier decision with the following addition: "In contrast to Dr. Mehar, Dr. Polepelle is a board-certified pain management specialist who is better trained to make an evaluation of residual functional capacity. The undersigned has given the greatest amount of evidentiary weight to Dr. Polepelle's independent report." *Id.* at 50. At step four, the ALJ found that Salisbury was unable to perform any past relevant work through the date last insured. *Id.* at 51. Nevertheless, considering his age, education, work experience, and residual functional capacity, and based on both the Medical Vocational Guidelines and the testimony of the vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Salisbury could have performed, namely, a surveillance system monitor, table worker, and telephone quotation clerk. *Id.* at 52. Thus, the ALJ concluded that Salisbury was not under a disability from at any time from March 3, 2008, the alleged onset date, through December 31, 2008, the date last insured. *Id.*

### 3. The 2018 ALJ Decision

On September 26, 2018, ALJ Singh issued a written decision following remand from the Court, concluding that Salisbury was not under a disability from March 3, 2008, through the date last insured. *Id.* at 1063–79. At the outset, the ALJ noted that she was directed by the Appeals Council to do the following:

1.  Further develop the record by, *inter alia*, using "every reasonable effort" to seek the needed clarifications from both Drs. Mehar and Rochman.

2.  Substantiate or reconsider the discounting of Dr. Mehar's assessment of the claimant's inability to carry and the off-handed rejection of Dr. Rochman's 2011 report as retrospective.

3.  Reassess the evaluation of the various medical sources in light of, *inter alia*: a) the length of Dr. Mehar's treatment relationship with plaintiff; b) the reality that Dr. Polepalle performed only a single examination; c) Dr. Rochman's professional credentials; d) the frequency of plaintiff's visits with Dr. Rochman and his treatment notes from 2009 and early 2010; e) the social worker records from "MEB"; f) the date on which plaintiff initially sought help for his depression from East Orange; and g) Dr. Hosain's pre-date-last-insured notes regarding the interplay between plaintiff's depression and pain.

4.  Ground the assignment of weight to medical sources in good, non-arbitrary reasons and specific citations to the record: a) the weight afforded physicians' opinions of plaintiff's employment prospects, given their collective lack of vocation expertise; b) the selectively utilized portions of Dr. Polepalle's report; c) the various findings vis-à-vis the categories of functional mental limitations; and d) the plaintiff's March 2009 "function report."

5.  Properly evaluate plaintiff's credibility.

6.  Account for even non-severe impairments in the evaluation of claimant's residual functional capacity.

7.  Given this reevaluation, arrive at an updated RFC, which should inform on the appropriateness of reliance on the Grids and a possibly new vocational profile.

*Id.* at 1063–64.

Beginning the five-step inquiry, the ALJ first determined that Salisbury did not engage in substantial gainful activity during the period from his alleged onset date of March 3, 2008 through his date last insured of December 31, 2008. *Id.* at 1066. At step two, the ALJ found Salisbury's depression, in addition to his bilateral

facet arthritis and obesity, to be severe impairments, while his ulcerative colitis was not. *Id.* at 1067. The ALJ found, at step three, that none of Salisbury's impairments, singly or in combination, met or medically equaled a listing. *Id.* at 1067–68. The ALJ "considered the listings generally under 1.00 Musculoskeletal System and specifically, [found that] the medical records do not illustrate evidence of nerve root compression, motor loss, reflex loss or sensory loss or consistent positive straight leg raising examinations in both the sitting and supine position." *Id.* at 1068. Furthermore, the ALJ concluded that "t[he] severity of [Salisbury's] mental impairments did not meet or medically equal the criteria of listing 12.04." *Id.* With respect to Paragraph B criteria, the ALJ concluded that Salisbury had a moderate limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation with regard to concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing oneself. *Id.* at 1068–69. Concerning Paragraph C criteria, although the ALJ found that Salisbury's mental impairments have persisted for more than two years and that he was receiving treatment in the form of outpatient therapy, she also noted that "the evidence fails to show that [Salisbury] has achieved only marginal adjustment as [his] treatment has been intermittent" and that he was able to "take care of his basic daily needs without serious mental or physical interference." *Id.* at 1069.

At this point in the inquiry, the ALJ determined Salisbury's residual functional capacity as the following:

[T]he claimant had the residual functional capacity to perform sedentary work . . . except the claimant requires a sit/stand opinion defined as—after every two to three minutes of standing up at the work station, he is allowed a minute to shift positions to sit back down—yet he will remain at the work station, and on task. The claimant can do all postural maneuvers occasionally—except he can never climb ladders, ropes or scaffolds. Further, the claimant is limited to frequent pushing and pulling with the upper extremities. Lastly, the claimant is limited to understanding, remembering and carrying out simple, routine, non-complex tasks.

*Id.*

In arriving at this RFC determination, the ALJ found that Salisbury's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Salisbury's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." *Id.* at 1070. In consideration of Salisbury's mental impairment, the ALJ reduced his "functioning to understanding, remembering and carrying out simple, routine, non-complex tasks." *Id.* at 1071. In consideration of his back impairment and obesity, the ALJ limited Salisbury to less than the full range of sedentary work, including a sit stand option, a postural limitation and pushing/pulling limitations described in the above residual functional capacity. *Id.* at 1071–72.

These limitations were based on the ALJ according certain weight to various medical opinions.

- With respect to Dr. Mehar, the ALJ accorded "some weight" to his opinion that Salisbury "retains the ability to sit, stand and walk consistent with sedentary exertional work" because it "is supported by the objective findings of Dr. Mehar and Dr. Hosain" but "little weight to Dr. Mehar's limitation on the

claimant's ability to lift as the records do not reveal any ongoing or consistent physical examination that would support [such] a finding" and no weight to "Dr. Mehar's opinion regarding the claimant's social interactions [because it] is outside his scope of expertise and the East Orange Psychiatric Association record fails to buttress such a limitation." *Id.* at 1072.

- The ALJ accorded "little weight" to the opinion of physical therapist Ms. Ferrari, who described the claimant's activities of daily living functioning as "severely restricted" and opined that the claimant "cannot work" or lift/carry five pounds." The ALJ reasoned that "a conclusion whether the claimant [] 'cannot work' is a determination reserved to the Commissioner"; "this opinion fails to provide a specific function-by-function analysis of the claimant's abilities"; "the use of the term 'severely restricted' describing the claimant's daily living functioning, does not provide a pinpointed perspective of what the claimant is able to do or not do"; and "the record simply does not support a five-pound lifting restriction as physical examinations revealed no muscle weaknesses." *Id.* at 1072–73.

- The ALJ gave "Dr. Polepalle's assessment that the claimant is able to return to previous activities including his work and doing some housekeeping, little weight, as it is inconsistent with physical findings, and treatment modalities throughout the record. . . . [and because] Dr. Polepalle's one time opinion does not consider the subsequently produced medical development after 2008." *Id.* at 1073.

- The ALJ accorded "some weight" to Dr. Hosain's opinion that Salisbury is "disabled" from his occupation as a landscaper, or any "physically demanding occupation," because although it is "outside Dr. Hosain's area of expertise," the ALJ found "his physical examination and assessment . . . convincing, resulting in a functional capacity reduction." *Id.* The ALJ assigned "great weight" to Dr. Hosain's opinion that the claimant is unable to bend without severe pain, lift more than ten pounds, and requires a sit/stand option, because "it is consistent with the record as a whole, which described various treatment modalities with ongoing physical examinations recounting the claimant with reduced range of motion. A sit/stand option defined as— after every two to three minutes of standing up at the working station, the claimant is allowed a minute to shift positions to sit

back down—yet he will remain at the workstation, and on task, accurately considers Dr. Hosian's opinion." *Id.* at 1073–74.

- The ALJ accorded "little weight" to Dr. Rochman's opinions that (1) the claimant has an extreme limitation in maintaining social functioning and a marked limitation in concentration, persistence or pace and (2) his impairments or treatment would cause an absentee rate of over four days per month as the claimant's residual disease results in marginal adjustment that even a minimal increase in demands or changes in the environment would cause decompensation. *Id.* at 1074. The ALJ reasoned that Dr. Rochman's opinions were inconsistent with his own treatment records in which he described the claimant's mood as stable; the opinions were also inconsistent with the claimant's treatment prior to his date last insured, as Dr. Hosain described the claimant with "normal affect and mood" with good recall of past events in the near term and long term; and the record does not display any ongoing or consistent abnormalities in concentration or social functioning. *Id.* Notwithstanding his assignment of little weight to these opinions, the ALJ accounted for anomalies in Salisbury's mental functioning, by reducing him to understanding, remembering and carrying out simple, routine, non-complex tasks. *Id.*

- The ALJ accorded "great weight" to Dr. Figueroa's opinion that Salisbury has moderate limitations in his ability to repetitively bend, lift or carry, because it is consistent with Dr. Hosain's examinations of the claimant and with Dr. Levin's physical examination of the claimant. *Id.* at 1075. However, the ALJ assigned "little weight" to Dr. Figueroa's opinion that the claimant could sit for only three hours in an eight-hour workday at thirty-minute increments as he "sometimes" requires a cane to ambulate distances longer than 400 feet. *Id.* The ALJ reasoned that the record is devoid of any indication that the claimant requires a cane and that Dr. Figueroa's opinion does not consider Dr. Hosain describing the claimant's injections as a "tremendous help" to the claimant's pain or the fact that the claimant did not receive treatment from September 20 to August 2013. *Id.* Despite according little weight to Dr. Figueroa's assessed functioning, the ALJ included a sit/stand option at the sedentary work exertional level. *Id.*

- While the ALJ gave an unidentified amount of weight to Dr. Murphy's opinion that the claimant has no limitation in his

ability to follow, understand, and perform simple directions or instructions, no limitation to the ability to maintain attention and concentration and no limitation on his ability to maintain a regular schedule or adequately relate to others, he accorded "little weight to Dr. Murphy's assessment that the claimant has a marked limitation in his ability to learn new tasks or perform complex tasks and in the ability to interact with the general public, as the record does not indicate that the claimant has issues with attention, concentration or social interactions." *Id.* at 1076. Notwithstanding, the ALJ reduced the claimant's functionality to understanding, remembering and carrying out simple, routine, non-complex tasks. *Id.*

In assessing Salisbury's credibility, the ALJ provided a number of reasons to discredit his allegations. She considered, first, that his daily activities were not limited to the extent one would expect given the complaints of disabling symptoms and limitations; second, although the claimant has received treatment for his impairments, his medications would not prevent him from engaging in the sedentary residual functional capacity with a sit/stand option; third, the record does not contain any non-conclusory opinions from any physician, treating or otherwise, indicating that the claimant is currently disabled; fourth, a review of the claimant's work history and earnings show that his business ended partly due to a dissolution and had profits continued, his disability application would be denied; moreover, his psychiatric treatment did not commence until 2009, which was after the date last insured and during a period of financial stress; furthermore, the claimant demonstrated some degree of management and organization skills from co-owning a business and outsourcing labor; finally, the claimant's symptoms and related limitations are not consistent with the evidence in the record. *Id.* at 1076–77.

At step four, the ALJ concluded that Salisbury was unable to perform any past relevant work. *Id.* at 1077–78. Nevertheless, considering his age, education, work experience, and residual functional capacity, and based on the testimony of the vocational expert, the ALJ found that there were jobs that existed in significant numbers in the national economy that the claimant could have performed, namely, charge account clerk, surveillance system monitor, and table worker. *Id.* at 1078–79.

## C.    Analysis

### 1.    The ALJ's RFC Determination is Not Supported by Substantial Evidence

Both Salisbury and the Commissioner maintain that the ALJ's residual functional capacity determination lacks substantial support from the record evidence. The Court agrees that the ALJ's RFC determination is flawed, but for different reasons than those submitted by the parties. Salisbury argues that the ALJ erred in failing to accord controlling weight to treating physician Dr. Mehar and treating psychiatrist Dr. Rochman. Pl. Mem. at 16–21. The Commissioner does not address whether the treating physician rule was violated but contends instead that "the ALJ failed to provide a narrative discussion which described how the evidence supported each conclusion in the RFC determination." Def. Mem. at 21. Because the ALJ erred in substituting her own judgment for competent medical opinion, the Court concludes that substantial evidence does not support the ALJ's RFC assessment.

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a claimant's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions a claimant is capable of performing, and may not simply make conclusory statements regarding a claimant's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, as well as non-medical evidence. *Trail v. Astrue*, No. 09-CV-1120 (DNH) (GNL), 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996)), *adopted by* 2010 WL 3825627 (Sept. 24, 2010).

Here, the ALJ assessed the following residual functional capacity for Salisbury:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except the claimant requires a sit/stand option defined as—after every two to three minutes of standing up at the work station, he is allowed a minute to shift positions to sit back down—yet he will remain at the workstation, and on task. The claimant can do all postural maneuvers occasionally—except he can never climb ladders, ropes or scaffolds. Further, the claimant is limited to frequent pushing and pulling upper extremities. Lastly, the claimant is limited to understanding, remembering and carrying out simple, routine non-complex tasks.

AR at 1069. With these exceptions, the ALJ limited Salisbury "to less than the full range of sedentary work." *Id.* at 1072.

### a. The Determination that Salisbury Can Perform Less than the Full Range of Sedentary Work as Defined by the ALJ Lacks Substantial Support

While acknowledging that the ALJ failed to describe how the evidence supports her RFC determination, the Commissioner takes particular issue with the sit/stand option as unsupported by the evidence in the record. Def. Mem. at 21. However, this part of the ALJ's RFC assessment appears to be the only portion that is remotely supported by the record evidence. The ALJ cites specifically to Dr. Hosain's November 11, 2011 letter in which he opines that Salisbury "has to make frequent changes of position when sitting or standing." AR at 1073 (citing *id.* at 1052). Notwithstanding this finding and more importantly, there is no medical opinion in the record suggesting that Salisbury is otherwise capable of the full range of sedentary work.

"According to the SSA, sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day . . . and lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (internal citation omitted) (emphasis in original); *see also Carvey v. Astrue*, 380 F. App'x 50, 52 (2d Cir. 2010) ("in the Social Security context, a person must be able to lift ten pounds occasionally, sit for a total of six hours, and stand or walk for a total of two hours in an eight-hour workday to be capable of 'sedentary work'").

Not one medical source unambiguously opined that Salisbury was capable of sitting for a total of six hours in a workday. The only sources who specifically opined on Salisbury's sitting capacity were Dr. Mehar, who contradictorily opined both that he could and could not sit for up to six hours per workday; SDM DelNero, a non-medical professional, who determined that Salisbury could sit for six hours in an eight-hour workday; and Dr. Figueroa, who assessed that Salisbury could sit for 30 minutes without interruption but for three hours total in an eight-hour workday. The ALJ does not specifically credit SDM DelNero for anchoring Salisbury's baseline exertional level as sedentary. Assuming the ALJ implicitly did so, "it is [] legal error to weigh an SDM's opinion as if he or she were a medical professional." *Barrett*, 286 F. Supp. 3d at 429 (citing *Box v. Colvin*, 3 F. Supp. 3d 27, 46 (E.D.N.Y. 2014)). Moreover, Dr. Figueroa's one-time consultative examination occurred in 2017, nine years after the relevant period. Because there is no indication that Dr. Figueroa retrospectively evaluated Salisbury's physical condition during the relevant period, much less that she reviewed the available medical evidence for that period, her assessment sheds little light on Salisbury's past sitting capacity.

Dr. Mehar indicated in his October 2008 functional assessment that Salisbury could sit for up to six hours in an eight-hour workday, whereas he determined in his January 2009 assessment that he could not sit for six hours per day. *Compare* AR at 846 *with id.* at 536. In both assessments, Dr. Mehar determined that Salisbury could only stand or walk for less than two hours. *Id.* at 536, 846. The ALJ "accord[ed] some weight to Dr. Mehar's opinion that the

71

claimant retains the ability to sit, stand and walk consistent with sedentary exertional work." *Id.* at 1072. However, as Salisbury correctly notes, "this does not coincide with Dr. Mehar's opinion at all." Pl. Mem. at 18. One of two opinions by Dr. Mehar describes *less* than sedentary work. Although the ALJ acknowledges elsewhere in her decision that she limited Salisbury "to less than the full range of sedentary work," AR at 1072, she does so by incorporating the sit/stand option, not by accounting for his inability to sit for a total of six hours in an eight-hour workday, as Dr. Mehar opined, albeit inconsistently.

While the Court is mindful of this inconsistency in Dr. Mehar's assessments as well as the sparse objective findings in his own progress notes, the first instruction on both remands from the Appeals Council was for the ALJ to seek out clarification from Dr. Mehar (as well as Dr. Rochman) for the basis of his opinion. There appears to have been no effort to comply with this directive and the Commissioner appears to concede as much. Def. Mem. at 2 n.3. The administrative process for the resolution of disability claims is non-adversarial, and all parties are under an obligation to make their best efforts to bring the matter to the fairest possible resolution. *See Pratts,* 94 F.3d at 37 ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.' This duty . . . exists even when . . . the claimant is represented by counsel.") (citations omitted) (alterations in original). The ALJ was obligated to make a good faith attempt to cure the deficiencies in the prior decisions in this case and to procure the further

information required by the Appeals Council. Indeed, a proper evaluation of Dr.

Mehar's conclusions regarding Salisbury's physical limitations has been a driving

force for the two Appeals Council remands in this now 11-year-old case. *See*

Appeals Council Remand, February 23, 2016, AR at 1441 (citing *Salisbury I*, 2015

WL 5458816 at *47 ("Further develop the record by, *inter alia*, using "every

reasonable effort" to seek the needed clarifications from both Drs. Mehar and

Rochman.")); Appeals Council Remand Order, July 18, 2011, AR at 138–39 (ordering

ALJ to re-contact treating sources). In this case especially, where a phone call, or

even a second letter, would likely have attracted the attention of Dr. Mehar or at

least would have revealed the best way to reach him, the lack of a diligent effort to

address a problem that has plagued this case from the beginning is troubling.

Even if it was proper for the ALJ to disregard the opinion of Dr. Mehar on

this point—indeed, the Court is cognizant of Salisbury's own testimony that Dr.

Mehar did not actually treat his back impairment, *see id.* at 104, 1097—the Court is

struck by the ALJ's failure to seek a functional assessment by the two physicians

who did, in fact, treat Salisbury's back condition, Drs. Levin and Hosain, and

therefore who were in the best position to evaluate his sitting capacity at that time.

Indeed, both physicians saw Salisbury multiple times during the relevant time

period, documented detailed findings upon each examination, prescribed a number

of treatments (including physical therapy, pain relief medication, and injections),

and consistently kept Salisbury from returning to work until further notice due to

his back pain. Consequently, the ALJ's finding that Salisbury was capable of

performing sedentary work (with a sit/stand option) was improperly based on her own assessment of the medical record. The record lacks any unambiguous medical opinion that Salisbury could sit for six hours or stand for two hours a day, as would be required in a sedentary job. Yet the ALJ somehow determined that he could perform sedentary work with specific additional limitations. It is well-settled that "[a]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Wilson v. Colvin*, No. 13-CV-6286P (MWP), 2015 WL 1003933, at *21 (W.D.N.Y. Mar. 6, 2015) (citation omitted). Thus, even though the Commissioner is empowered to make the RFC determination, "[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities," the general rule is that the Commissioner "may not make the connection himself." *Id.* (citation omitted).

"Because there is no medical source opinion supporting the ALJ's finding that [Salisbury] can perform sedentary work, the [C]ourt concludes that the ALJ's RFC determination is without substantial support in the record and remand . . . is appropriate." *House v. Astrue*, No. 11-CV-915 (GLS), 2013 WL 422058, at *4 (N.D.N.Y. Feb. 1, 2013). *See also Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir. 1998) ("The Commissioner, who has the burden on the issue, failed to introduce any medical evidence that [plaintiff] could hold a sedentary job. To the contrary, [plaintiff's] treating physicians concluded that [plaintiff] could not sit for long

periods of time and therefore could not perform "sedentary work," as defined by 20 C.F.R. § 404.1567."); *Tricic v. Astrue*, No. 07-CV-997 (NAM), 2010 WL 3338697, at *3–4 (N.D.N.Y. Aug. 24, 2010) (ALJ's determination that plaintiff could stand/walk and sit for about six hours in eight-hour workday was not supported by substantial evidence where two treating doctors opined that plaintiff should avoid prolonged sitting and/or standing, and no examining doctor provided specific opinion about plaintiff's ability to sit or stand for particular periods of time).[13]

> **b.    The Determination that Salisbury Can Be On Task At All Times Lacks Substantial Support**

The ALJ's mental RFC determination also lacks substantial support in the record.  The ALJ concluded only that Salisbury was "limited to understanding, remembering and carrying out simple, routine non-complex tasks" but otherwise would remain on-task at all times.  AR at 1069.  The only opinion in the record that

---

[13] Because the Court remands on this basis, it need not address whether the other aspects of the ALJ's physical RFC determination are supported by the record.  The Court notes, however, "[p]ostural limitations . . . would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work."  SSR 96-9p, 1996 WL 374185, at *7 (SSA July 2, 1996).  Likewise, "[l]imitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base."  *Id.* at *6.  There appears to be some inconsistency among Salisbury's treating physicians regarding the amount of weight he could carry or lift.  *Compare* AR at 1052 (Dr. Hosain opining that Salisbury could not lift more than ten pounds) *with id.* at 536 (Dr. Mehar indicating that he could not lift any weight).  "An inability to lift or carry more than 1 or 2 pounds would erode the unskilled sedentary occupational base significantly."  SSR 96-9p, 1996 WL 374185, at *6.  However, in light of the Court's conclusion that the ALJ's physical RFC determination is without substantial support in the record, the Court will not analyze whether the ALJ's apparent decision to credit Dr. Hosain's opinion over Dr. Mehar's on this point was proper.

reflects this assessment is from Dr. Murphy, who opined that Salisbury was limited to simple work-related tasks but otherwise had no limitation in his ability to maintain concentration and attention. The ALJ, however, never explicitly credited her. Even if she did so implicitly, like Dr. Figueroa, Dr. Murphy conducted a consultative examination in 2017. Thus, her opinion is hardly enlightening as to Salisbury's mental state nine years prior. Moreover, the ALJ herself concluded, at step three, that Salisbury had a moderate limitation with regard to concentrating, persisting, or maintaining pace. AR at 1068. Yet the ALJ failed to incorporate her own finding in assessing Salisbury's mental residual functional capacity. This is particularly problematic because, during the 2018 hearing, the ALJ crafted a hypothetical question for the vocational expert based on Salisbury being off-task 15% of the time due to attention or concentration problems. *Id.* at 1115. The vocational expert testified that with these limitations, a claimant would not be able to perform any work. *Id.* The ALJ, therefore, was aware that this particular mental limitation was critical to the ultimate question of disability. Nevertheless, the ALJ failed to discuss this limitation or even acknowledge its existence in her RFC assessment.

Although the Commissioner makes no argument regarding the ALJ's weighing of the opinion evidence, it is worth noting that Dr. Mehar opined that Salisbury was limited with respect to sustained concentration and persistence, while Dr. Rochman similarly opined that he had marked deficiencies of concentration, persistence, or pace. Even accepting the ALJ's reason for rejecting

Dr. Mehar's opinion—that it "is outside his scope of expertise," *id.* at 1072—the ALJ does not provide good reasons for according less than controlling weight to the opinion of treating psychiatrist Dr. Rochman (and, again, the Commissioner makes no such argument that to do so would have been proper). The ALJ reasoned that Dr. Rochman's 2011 opinion was inconsistent with his own treatment notes, Dr. Hosain's notes, and Dr. Murphy's consultative examination. However, upon a closer examination of these reasons, the Court concludes that the ALJ cherry-picked two positive references in the set of therapy notes, which as a whole, described an isolated, hopeless, and insecure individual; Dr. Hosain was Salisbury's pain management physician and thus any purported mental assessment was outside the scope of his treatment; and Dr. Murphy's consultative examination in 2017 does not purport to opine retrospectively and therefore may not necessarily constitute substantial evidence. As discussed above, the ALJ failed to seek clarification from Dr. Rochman about his medical opinion, which the ALJ had been repeatedly instructed by the Appeals Council to do. Because there was insufficient evidence to reject the opinion of treating psychiatrist Dr. Rochman without further clarification, the ALJ's mental RFC determination also lacks substantial support.

2. **The ALJ's Credibility Determination is Not Supported by Substantial Evidence**

The ALJ also erred in her assessment of Salisbury's credibility. It is the province of the Commissioner and not the reviewing court to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Thus, if the Commissioner's

credibility findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1980)). "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96–7p, 1996 WL 374186, at *4. These reasons "must be grounded in the evidence and articulated in the determination or decision." *Id.*

Here, the ALJ did not discuss Salisbury's testimony at any of the three administrative hearings or the sworn statements offered by his wife. Moreover, while the ALJ gave specific reasons in support of her assessment of Salisbury's credibility, these reasons are not supported by substantial evidence. The ALJ first concluded that "the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant can take care of his daily needs without serious mental or physical interference—including basic house management, traveling (vacationing) and adhering to the daily needs of his three children, albeit [with] assistance from his wife." AR at 1076 (citing, *inter alia, id.* at 1927). As an initial matter, the ALJ cites to a 2015 progress note mentioning that Salisbury is "[g]oing on vacation." *Id.* at 1927. It is unclear to the Court how taking a trip in 2015 is indicative of being capable of sedentary work in 2008.

Moreover, although it was certainly proper for the ALJ to consider Salisbury's daily activities in assessing his credibility, including his ability to do housework and care for his children, *see* 20 C.F.R. § 404.1529(a), (c)(3), the ALJ should have looked deeper into Salisbury's actual performance of these duties. By his own admission, Salisbury helped care for his three young children. But the record as a whole indicates that Salisbury did little more than the bare minimum daily activities with his children: give them their meals and watch them play. Otherwise, his wife and the family babysitter were responsible for preparing their meals, changing their clothes, and putting them to bed. AR at 606, 615. Indeed, Salisbury testified that he could not carry or play with his children like he used to. *Id.* at 606. The Second Circuit has long held that a claimant need not be an invalid, incapable of performing any daily activities, in order to receive disability benefits. *See, e.g.*, *Balsamo*, 142 F.3d at 81; *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989) ("When a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working."). Salisbury testified that he spent most of his time during the day in his recliner, AR at 606, 609, and the record as a whole supports this testimony. As far as housework is concerned, again, it appears that Salisbury did little more than the bare minimum. *Id.* at 608, 1670. He testified that he "rel[ies] on [his] wife for everything," *id.* at 615, which his wife and the notes from his therapy sessions corroborate in detail. *Id.* at 326, 828–36, 1626–29.

The ALJ also reasoned that "when considering the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms, it would not prevent the claimant from engaging in the above sedentary residual functional capacity, with a sit/stand option." *Id.* at 1076–77. Not only did the ALJ fail to cite to any support for this claim, but there is ample evidence in the record strongly suggesting otherwise—that is, it does not appear that his impairments were controlled or even amenable to treatment or medication, thereby further supporting a finding of disability. *See*, *e.g.*, *id.* at 1052 ("The patient has received treatments including trigger point injections with some limited and temporary relief of his pain. He undergoes tripper point injections at intervals of about 2-3 months. The patient has tried physical therapy with limited relief of his pain. . . . [S]ince he has not responded to medical treatments or injections with resolution of his pain he may continue to experience pain for at least many years.").

The ALJ's third reason to discredit Salisbury—that "the record does not contain any non-conclusory opinions, supported by clinical or laboratory evidence, from treating or examining physicians indicating that the claimant is currently disabled," *id.* at 1077—is factually inaccurate as two treating physicians—Dr. Hosain and Dr. Levin—made statements, supported by their examination findings, that they were keeping Salisbury from returning to work. *Id.* at 649, 652, 719, 1783, 1787–88. Similarly, the ALJ's fourth reason—"[A] review of the claimant's work history and earnings described in Finding 2, reveal that the claimant's work ended partly due to business dissolution. . . . [I]f profits continued the claimant's

disability application would be denied on Step 2 grounds, in spite of the medical record," *id.*— overlooks Salisbury's explanation that the business dissolved precisely because he was experiencing disabling symptoms and therefore could not perform his previous duties, which, again, is substantiated by his treating physicians Drs. Levin and Hosain.

Finally, the ALJ maintained that "the claimant's symptoms and related limitations are not consistent with the evidence." *Id.* However, the ALJ cherry-picked several isolated portions of treatment notes that were supportive of her decision and disregarded the majority of the medical evidence in the record, including that of treating physicians Drs. Levin and Hosain. This type of selective analysis of the record is improper. *See, e.g., Cautillo v. Berryhill*, No. 17-CV-1356 (KPF), 2018 WL 1305717, at *26 (S.D.N.Y. Mar. 12, 2018) ("[A]n administrative law judge may not 'cherry-pick' medical opinions that support his or her opinion while ignoring opinions that do not.") (quoting *Tim v. Colvin*, No. 12-CV-1761 (GLS), 2014 WL 838080, at *7 (N.D.N.Y. Mar. 4, 2014)); *accord Artinian v. Berryhill*, No. 16-CV-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018) ("Federal courts reviewing administrative social security decisions decry 'cherry picking' of relevan[t] evidence, which may be defined as inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source."); *Collins v. Colvin*, No. 15-CV-523 (FPG), 2016 WL 5529424, at *3 (W.D.N.Y. Sept. 30, 2016) (ALJ "may not credit evidence that supports administrative findings while ignoring conflicting evidence from the same source").

Accordingly, the Court concludes that the reasons that the ALJ gave for discrediting Salisbury are not supported by substantial evidence.

### 3. Because the Record Contains Persuasive Proof of Disability, The Appropriate Remedy is Remand Solely for the Calculation of Benefits

Given that the Commissioner, on remand, did not remedy the fact that the ALJ's RFC determination was not supported by substantial medical evidence on a fully developed record, this case must be remanded again. Both Salisbury and the Commissioner agree that remand is necessary, but they disagree as to whether remand should be for further administrative proceedings or solely for the calculation of benefits. Salisbury argues that the Court should reverse and award benefits on the grounds that the record contains persuasive proof of disability and that a remand for further evidentiary proceedings would serve no purpose. The Commissioner, however, seeks a remand for further evidentiary proceedings that would allow the ALJ to re-evaluate the opinion evidence and adequately identify the evidence supporting the RFC finding. Because the well-developed record contains substantial evidence of Salisbury's disability and because the Commissioner has twice failed to marshal substantial evidence to support his finding to the contrary, and in light of the 11-year adjudicatory delay in this case for the ten-month period at issue, the Court concludes that remand for further proceedings is unnecessary and orders a remand solely for the calculation of benefits.

After reviewing the decision of the Commissioner, a court may affirm, modify, or reverse that decision upon the pleadings and record, "with or without remanding

the cause for a rehearing." 42 U.S.C. § 405(g). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard . . . remand to the Secretary for further development of the evidence" is generally appropriate. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). On the other hand, remand for the determination of benefits is warranted "'when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose.'" *Id.; see also Valerio v. Comm'r of Soc. Sec.*, No. 08-CV-4253 (CPS), 2009 WL 2424211, at *17 (E.D.N.Y. Aug. 6, 2009) (Where there is "'no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits'") (quoting *Rosa*, 168 F.3d at 72).

In order to qualify for DIB benefits for the closed period, Salisbury must have been disabled on or before December 31, 2008, his date last insured. *See Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989) (plaintiff can only be entitled to "period of disability," if his continuous disability began before date on which his insured status lapsed) (citing 20 C.F.R. § 404.320(b) (2)); *Swainbank v. Astrue*, 356 F. App'x 545, 547 (2d Cir. 2009). Given the totality of the extensive record in this case, I am persuaded that the evidence leads to the conclusion that Salisbury was disabled on his date last insured and that the Commissioner cannot, on remand, develop or articulate further evidence supporting the opposite conclusion.

The record provides persuasive evidence that Salisbury's back impairment was disabling. The imaging studies in the record—showing evidence of

degenerative disc disease and bilateral facet arthritis, AR at 494–98—provide objective support for the severity of Salisbury's symptoms, which were corroborated by his wife and by notes from his treating physicians. The imaging studies also provide support for the 2009 opinion of treating physician Dr. Mehar that Salisbury could not sit for six hours per day and therefore lacked the RFC to perform full-time sedentary work under the regulations. *See*, *e.g.*, *Brown v. Bowen*, No. 82-CV-3403 (TPG), 1988 WL 138157, at *7 (S.D.N.Y. Dec. 14, 1988) ("If plaintiff could only sit for 3–4 hours per day, that would not support a finding that she could perform sedentary work.").

Even if the ALJ properly discounted Dr. Mehar's opinion, medical records indicate that from the date of the injury through at least September 2008, Salisbury was kept out of work by other doctors who were more intimately aware of his back condition. There are a number of notes in the record from two treating physicians—Drs. Levin and Hosain—advising that Salisbury was temporarily or permanently disabled during the relevant time period and that he should not return to work. AR at 649, 652, 719, 1783, 1787–88. The Court recognizes that these disability findings were not binding on the ALJ but, given that they are all so similar in nature and are supported by the medical evidence, the Court concludes that the ALJ failed to accord the opinions of Salisbury's treating physicians the controlling weight they should have received.

The ALJ ultimately found that Salisbury could not even perform the full range of sedentary work. *Id.* at 1072. Any more limitations to his RFC would, of

course, further erode his ability to perform other, less than sedentary work.  *See*

SSR 96-9p, 1996 WL 374185, at *7 (SSA July 2, 1996) (individuals who may be able

to sit for a time but must get up and stand or walk for a while before returning to

sitting are not functionally capable of doing the prolonged sitting contemplated by

sedentary work).  Indeed, although the RFC findings that were described in the

ALJ's primary hypothetical to the vocational expert were not, as discussed above,

supported by substantial evidence, the ALJ's second hypothetical to the vocational

expert incorporated the limitation in attention and concentration that the ALJ had

earlier found.  AR at 1115.  In response to that hypothetical, the vocational expert

testified that no jobs existed in the national economy which could be performed by

such an individual.  *Id.*  Because the record provides persuasive proof of Salisbury's

disability, application of the legal standards could only lead to one conclusion:

Salisbury was incapable of performing the full range of sedentary work such that he

was under a disability, as defined in the Social Security Act.  *See, e.g., Minor v.*

*Astrue*, No. 11-CV-6556 (MAT), 2012 WL 5948952, at *7 (W.D.N.Y. Nov. 28, 2012)

(reversed and remanded solely for calculation of benefits where "the Commissioner's

decision to deny the Plaintiff benefits was not supported by substantial evidence in

the record and was marred by several legal errors" and where substantial evidence

in record demonstrated that plaintiff was disabled); *Maline v. Astrue*, No. 08-CV-

1712 (NGG), 2010 WL 4258259, at *2 (E.D.N.Y. Oct. 21, 2010) ("Remand for the

calculation of benefits is appropriate when the record provides persuasive proof of

disability and the application of the correct legal standards 'could lead to only one conclusion.'") (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

A remand for calculation of benefits is also appropriate here because it is apparent that a more complete record could not support the Commissioner's decision. *See Rosa*, 168 F.3d at 83. This is not a case where the record contains an obvious gap or is otherwise undeveloped. *Cf. Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 345 (E.D.N.Y. 2010) (complete absence from file of contemporaneous medical evidence from two treating physicians meant that there were "clearly very significant gaps and deficiencies in the record," such that remand for further proceedings was warranted). Nor does the Commissioner argue that there is a complete absence from the record of contemporaneous medical evidence. To the contrary, this record is quite large, spanning two volumes, and appears to contain Salisbury's relevant medical history for the entire period. Yet on remand, when the record had been fully developed, the Commissioner did not obtain any contrary independent medical evidence and has twice failed to support his determination of non-disability with substantial evidence.

In remanding for the calculation of benefits, the Court is also swayed by the fact that the ALJ twice failed to comply with the Appeals Council's instructions to pursue further information and clarification from Drs. Mehar and Rochman. I have no reason to believe that yet another remand will remedy those problems. *See Balsamo*, 142 F.3d at 82. Even if, on remand, the ALJ were to conclude—based on clarification of their opinions—that Drs. Rochman and Mehar's conclusions are not

supported by the medical evidence, Salisbury's RFC would necessarily be more limited if the ALJ gives proper deference to the findings of treating physicians Drs. Levin and Hosain, which the ALJ also failed to do.

Salisbury filed his DIB application in January 2009, more than 11 years ago, for a ten-month period of disability. Since then, he has had three administrative hearings before two different ALJs, two Appeals Council orders remanding for further proceedings and a new decision, and one District Court order remanding for further proceedings and a new decision. Remanding for yet another proceeding and decision, particularly when the Commissioner has offered no suggestion that there is new evidence that would support a decision denying disability, could delay payment of Salisbury's benefits for many more years. Although the length of time that a claim has been pending is not a sufficient basis to reverse and award benefits, *see*, *e.g.*, *Giddings v. Astrue*, 333 F. App'x 649, 655 (2d Cir. 2009), there is no dispute that Salisbury carried his evidentiary burden of proving that he could not perform his past work. Furthermore, as discussed above, the ALJ should have sought clarification or supplementation of the opinions of treating physicians Drs. Mehar, Levin, and Hosain regarding Salisbury's physical limitations and Dr. Rochman regarding his mental limitations. Had she done so, Salisbury would have been found disabled, pursuant to the vocational expert's testimony. Thus, considering "the often painfully slow process by which disability determinations are made," *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983), and that no purpose would be served by remanding for further proceedings,

remand for the calculation of benefits is the more appropriate remedy in this case. *See, e.g., McClain v. Barnhart*, 299 F. Supp. 2d 309, 329–31 (S.D.N.Y. 2004) (in light of nine year adjudicatory delay in case, claim would be remanded for calculation of benefits where record contained compelling evidence of claimant's disability and where Commissioner had twice failed to marshal substantial evidence to support his finding to the contrary).

Based on the well-developed record containing substantial evidence that Salisbury suffered from physical and psychological impairments rendering him incapable of working, the failure of the Commissioner after three attempts to present evidence demonstrating that Salisbury's impairments were not disabling during the relevant period, and the length of time the claim has already consumed, the decision of the Commissioner is reversed.

## III.    CONCLUSION

For the foregoing reasons, Salisbury's motion is granted, and the Commissioner's cross-motion is denied. The Commissioner's decision is reversed, and the case is remanded solely for the calculation of benefits.

The Clerk of Court is directed to close docket entries 13 and 23, marking docket entry 13 as granted and docket entry 23 as denied and to enter judgment in favor of Salisbury.

**SO ORDERED.**

Date: February 26, 2020
     New York, New York

JAMES L. COTT
United States Magistrate Judge